IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MORNINGWARE, INC., | ) |
| Plaintiff, | ) |
| | ) No. 09 CV 4348 |
| v. | ) |
| | ) Honorable Amy J. St. Eve |
| HEARTHWARE HOME PRODUCTS, INC. | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

For the following reasons, the Court denies Defendant Hearthware Home Products, Inc.'s ("Hearthware") Motion to Dismiss for Failure to State a Claim ("Motion to Dismiss").

**BACKGROUND**

Plaintiff Moringware, Inc. ("Morningware") filed its complaint against Hearthware on July 20, 2009 ("Complaint"). Plaintiff's Complaint alleges five causes of action: (i) unfair competition in violation of 15 U.S.C. § 1125(a); (ii) product disparagement in violation of 15 U.S.C. § 1125(a)(1)(B); (iii) deceptive trade practices in violation of 815 ILCS 510/2; (iv) common law unfair competition; and (v) commercial disparagement. (R. 1-1, Complaint.)

According to the Complaint, Morningware is a corporation that sells consumer products including counter-top electric ovens. *Id.* at ¶ 6. Morningware has employed the MORNINGWARE mark since 2002 in connection with its counter-top ovens. *Id.* at ¶ 7. Morningware sells its ovens in retail locations and promotes them through a website, www.morningware.com. *Id.* at ¶¶ 8-9. The MORNINGWARE mark has become associated with Morningware and identifies Morningware as the source of goods and services associated

with the mark.  *Id.* at ¶ 3.

Hearthware is Morningware's nearest competitor in the counter-top electric oven market. *Id.* at ¶ 17.  Hearthware operates a website, www.mynuwaveover.com.  *Id.* at ¶ 3.  Hearthware participates in "pay-per-click" advertising offered by a variety of internet search engines, including Google, Yahoo, AOL and MSN.  *Id.* at ¶¶ 1, 22.  Internet search engines allow internet users to locate websites that correspond with keywords entered as search terms by users.  *Id.* at ¶¶ 4, 22.  An internet user enters a search term corresponding with the item in which they are interested and the search engine provider displays links related to that search term to the user in order of decreasing relevance as determined by the search engine provider.  *Id.* at ¶¶ 22-23.  As a result of this capability, search engines obtain a large percentage of their revenue from the sale of "contextual advertising" which permits companies to place their advertisements in front of consumers based on the search terms they enter.  *Id.* at ¶ 23.

By way of example, Google offers a keyword-triggered program, "AdWords."  *Id*. at ¶ 24.  When an internet user enters a search term into Google's search engine, in addition to the typical search results provided to the user, the search engine also generates links to advertisers who have "purchased" or "bid on" the search term entered by the user.  *Id.*  Search engines refer to these links as "Sponsored Links" and they appear on the top and margins of the search result pages.  *Id.*  Morningware's Complaint further alleges that "the search result pages are designed so that the 'Sponsored Link' display is inconspicuous, confusing and ambiguous so it is not apparent who 'sponsors' these links and whether a sponsor of the link is associated in any way with the company that is the subject of the search."  *Id.*  Google's trademark policy states that "the advertisers themselves are responsible for the keywords and ad content that they choose to use," and Morningware therefore alleges that "Hearthware remains liable for its decision to use

[Morningware]'s trademark as a keyword in Google's AdWords program." *Id.* at ¶ 26.

Hearthware has used Morningware's trademark, or variations of Morningware's trademark, as a keyword in Google's AdWords program. *Id.* at ¶ 27. If an internet user enters the term "Morningware" as a search term in Google, Hearthware's advertisement link appears before a link to Morningware's website. *Id.* The content of the link to Hearthware's website, www.mynuwaveoven.com, states, "The Real NuWave ® Oven Pro Why Buy an Imitation? 90 Day Gty." *Id.* at Ex. A. Morningware alleges that the topmost placement of Hearthware's advertisement on the search results page coupled with the "Why Buy an Imitation?" statement demonstrates a false claim of product superiority over Morningware's products, and that this misleads and/or confuses consumers into "believing that [Morningware]'s products are inferior to Hearthware's because they are 'Imitations,' and thus fakes, of Hearthware's products, which they are not." *Id.* at ¶ 30.

Morningware also alleges that through the use of Morningware's trademarks, Hearthware seeks to "exploit the hard-earned goodwill of [Morningware] and its products and services." *Id.* at ¶ 31. Specifically, Hearthware's use of Morningware's trademarks coupled with its "Imitation" advertisement reflects Hearthware's intention to divert consumers from Morningware's website to Hearthware's website. *Id.* Hearthware's actions mislead and/or confuse consumers into falsely believing that Morningware sponsors Hearthware's own website and potential customers have visited Hearthware's website after entering the search term "Morningware" believing that Moringware counter-top electric ovens are available from Hearthware. *Id.* at ¶¶ 33-34. Hearthware's actions have damaged Morningware. *Id.* at ¶ 27.

On September 21, 2009, Hearthware filed its Motion to Dismiss requesting the Court to dismiss each of Morningware's five causes of action against Hearthware. (R. 42-1, Motion to

Dismiss; R. 43-1, Memorandum of Law in Support of Motion to Dismiss ("Memorandum").)

## LEGAL STANDARD

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). As the Seventh Circuit recently explained, this "[r]ule reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570); *see also Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 803 (7th Cir. 2008) (amount of factual allegations required to state a plausible claim for relief depends on complexity of legal theory). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007).

## ANALYSIS

### I. Lanham Act - False Designation of Origin

"In order to succeed on [its] Lanham Act claim, Plaintiff must establish: (1) that [Plaintiff] owns a protectible trademark, and (2) that use of this mark by [Defendant] is likely to cause confusion among consumers." *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008) (citing 15 U.S.C. § 1125). The Lanham Act states:

> (a) Civil Action
> (1) Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

#### A. Protectible Trademark

Hearthware presents no arguments to establish that Morningware has not sufficiently alleged ownership in a protectible trademark. Morningware's Complaint alleges that "[Morningware] has used the MORNINGWARE mark since at least 2002 in the United States in connection with counter-top electric ovens," that "as a result of [Morningware]'s extensive and continuous use of the MORNINGWARE mark, it has become, and continues to be a valuable property right of [Morningware]," and that Hearthware's actions violate Morningware's trademark(s). (R. 1-1, Complaint.) These allegations are sufficient to withstand a motion to dismiss. *See, e.g., Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 762-766 (N.D. Ill.

2008) (holding that plaintiff's allegations that plaintiff owns the "Vulcan Gulf" trademark and the "Vulcan Golf" tradename and that vulcanogolf.com violates plaintiff's trademark on that name are sufficient to establish a protectible interest at the motion to dismiss stage).

      **B.**     **Use in Commerce**

In the present motion, Hearthware asserts that Morningware cannot meet the second element of its false designation of origin trademark infringement claim. Specifically, Hearthware argues that "[Hearthware]'s purchase of the keyword 'morningware' is not a use in commerce as required and defined by the Lanham Act" because "Hearthware never placed that term on any product, good, or service, or used it in any way that would indicate source or origin." (R. 43-1, Memorandum, p. 6.) There is no controlling Seventh Circuit authority governing whether the purchase of a trademarked term through a search engine's advertisement program constitutes a "use" pursuant to the Lanham Act. *See, e.g., Int'l Profit Assocs. v. Paisola*, 461 F. Supp. 2d 672, 677 (N.D. Ill. 2006) ("The law in the Seventh Circuit is silent on whether the use of a trademark as a keyword in an online search program such as Google's AdWords is a use 'in commerce' under the Lanham Act as required to establish a claim, but other courts have determined that purchasing a trademarked term as a 'keyword' for Google AdWords program meets the Lanham Act's use requirement.")

The parties spend a great deal of their Motion to Dismiss briefing disputing the holding of *Rescuecom*, a non-controlling decision by the Second Circuit. The defendant in the *Rescuecom* case was the search engine provider, as opposed to the plaintiff's competitor as in the present case. Notwithstanding this factual discrepancy, the Second Circuit's analysis and holding, which accord with the analyses of the majority of courts that have ruled on similar issues, are applicable and persuasive. In holding that the plaintiff adequately pled a Lanham Act

violation and established likelihood of confusion, the Second Circuit stated:

> Rescuecom has alleged that [Google's use of Rescuecom's trademark in its AdWords program causes likelihood of confusion], in that would-be purchasers (or explorers) of its services who search for its website on Google are misleadingly directed to the ads and websites of its competitors in a manner which leads them to believe mistakenly that these ads or websites are sponsored by, or affiliated with Rescuecom. This is particularly so, Rescuecom alleges, when the advertiser's link appears in a horizontal band at the top of the list of search results in a manner which makes it appear to be the most relevant search result and not an advertisement. What Rescuecom alleges is that by the manner of Google's display of sponsored links of competing brands in response to a search for Rescuecom's brand name (which fails adequately to identify the sponsored link as an advertisement, rather than a relevant search result), Google creates a likelihood of consumer confusion as to trademarks. If the searcher sees a different brand name as the top entry in response to the search for 'Rescuecom,' the searcher is likely to believe mistakenly that the different name which appears is affiliated with the brand name sought in the search and will not suspect, because the fact is not adequately signaled by Google's presentation, that this is not the most relevant response to the search. Whether Google's actual practice is in fact benign or confusing is not for us to judge at this time. We consider at the 12(b)(6) stage only what is alleged in the Complaint.

*Rescuecom Corp. v. Google, Inc.,* 562 F.3d 123, 130-31 (2d Cir. 2009).

Moreover, a review of case law outside of the Seventh Circuit reveals that a majority of courts have found that actions such as those taken by Hearthware in purchasing Morningware's trademark as a search term constitute a Lanham Act "use." *See, e.g, id.* (holding that allegations establishing display, offer and sale of plaintiff's trademark by Google to advertisers established a "use in commerce" under the Lanham Act sufficient to survive a motion to dismiss); *J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*, 2007 U.S. Dist. LEXIS 288 (E.D. Pa. Jan. 4, 2007) (finding that a competitor's use of company's name as a keyword under an advertising program offered by an internet search engine constituted a "use" under the Lanham Act); *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 527 F. Supp. 2d 205, 207 (D. Mass. 2007) ("Because sponsored linking necessarily entails the 'use' of the plaintiff's mark as part of a mechanism of advertising, it is 'use' for Lanham Act purpose")(reversed on other grounds); *Buying for the Home, LLC v. Humble Abode, LLC*, 459 F. Supp. 2d 310 (D.N.J. 2006) (holding

that a competitor's action in causing a sponsored ad to appear next to the results of an online search engine's search results using plaintiff's trademark constituted a "use" under the Lanham Act). Indeed, while not explicitly ruling on the issue presented here, at least one district court in this circuit has recognized that the term "use" under the Lanham Act "has been interpreted broadly in other cases involving the internet and domain names." *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 769 (N.D. Ill. 2008) (declining to dismiss case pursuant to 12(b)(6) motion where complaint sufficiently pled facts to establish that defendant's registering of domain names that were the same as or substantially similar to plaintiff's trademarks was a "use in commerce" under the Lanham Act). Like the court in *Vulcan Golf*, here the Court "simply cannot make a definitive ruling on the 'use' issue without engaging in fact-finding, which is inappropriate at this stage of the litigation." *See id.*

### C. Likelihood of Confusion

Hearthware also argues that, even if Morningware meets the use in commerce element, Morningware's claim fails because "no reasonable factfinder would find a likelihood of confusion under the alleged facts." (R. 43-1, Memorandum, p. 6.) Hearthware further contends that "[t]he mere purchase of keywords for use in internet search engine sponsored links programs does not cause consumer confusion." *Id.* Morningware, however, has alleged sufficient facts in its Complaint establishing the potential for initial interest confusion on the part of consumers.

"Initial interest confusion, which is actionable under the Lanham Act, occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated." *Promatek Indus., LTD v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002) (citing *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996)). "In assessing the likelihood of consumer confusion, we consider: (1) the

similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's." *Id.* at 812. Courts have recognized that "the 'likelihood of confusion' is a fact-specific inquiry best left for decision after discovery." *Vulcan Golf, LLC*, 552 F. Supp. 2d at 769 (N.D. Ill. 2008).

In *Promatek*, a competitor of plaintiff Promatek – Equitrac – employed Promatek's trademarked terms as meta-tags in its website. The more often a term appears in the meta-tags of a web page, "the more likely it is that the web page will be 'hit' in a search for that keyword and the higher on the list of 'hits' the web page will appear." *Id.* at 811. The Seventh Circuit held that there was a likelihood of initial consumer confusion and reasoned as follows:

> [A]lthough consumers are not confused when they reach a competitor's website, there is nevertheless initial interest confusion. This is true in this case, because by Equitrac's placing the term Copitrack [Promatek's trademark] in its metatag, consumers are diverted to its website and Equitrac reaps the goodwill Promatek developed in the Copitrak mark. That consumers who are misled to Equitrac's website are only briefly confused is of little or no consequence. In fact, 'that confusion as to the source of a product or service is eventually dispelled does not eliminate the trademark infringement which has already occurred.' What is important is not the duration of the confusion, it is the misappropriation of Promatek's goodwill. Equitrac cannot unring the bell. . . . Consumers who are directed to Equitrac's webpage are likely to learn more about Equitrac and its products before beginning a new search for Promatek and Copitrak. Therefore, given the likelihood of initial consumer confusion, the district court was correct in finding Promatek could succeed on the merits.

*Id.* at 812-13.

Given the Seventh Circuit's ruling in *Promatek*, Morningware has sufficiently alleged initial interest confusion. Morningware alleges that "Hearthware has used [Morningware]'s trademark, or variations thereof, as a keyword for use in Google's AdWords program," that if a user searches for the term "morningware" in Google, Hearthware's advertisement appears, and

that the website advertisement "misleads and/or confuses consumers." (R. 1-1, Complaint, ¶¶ 27-37.) Morningware has thus sufficiently pled initial interest confusion. *See Int'l Profit Assocs. v. Paisola*, 461 F. Supp. 2d 672, 676-77 (N.D. Ill. 2006) (analyzing plaintiff's likelihood of success on the merits after the filing of a motion for preliminary injunction based on defendant's incorporation of plaintiff's trademarks into search terms to lead users to defendant's website, the Court held that plaintiff "established through affidavits and attached materials that defendants are using terms trademarked by [plaintiff] as search terms in Google's AdWords program in a manner likely to cause confusion.")

The cases relied on by Hearthware in its Motion to Dismiss are inapposite. First, *U-Haul Int'l, Inc. v. WhenU.com, Inc.*, 279 F. Supp. 2d 723, 728 (E.D. Va. 2003), does not specifically address whether a plaintiff adequately pled consumer confusion. Instead, the court held that, in cases of comparative advertising, "'use' is not established merely because trademarks are simultaneously visible to a consumer." *Id.* at 728. Moreover, contrary to the facts of the present case, the Court's analysis in *U'Haul* resulted, in part, from allegations that the allegedly infringing pop-up advertisements resulted from "software [that] resides in individual computers as a result of the invitation and consent of the individual computer user." *Id.*

Similar to the facts of this case, *J.G. Wentworth*, 2007 U.S. Dist. LEXIS 288 (E.D. Pa. Jan. 4, 2007), involved a plaintiff who alleged that defendant infringed on plaintiff's mark when defendant used plaintiff's corporate name as a keyword in the Google AdWords program so that an internet search for those terms produced a sponsored link to defendant's website. The court found that no initial interest confusion occurred due to the "separate and distinct nature of the links created on any of the search results pages in question." *Id.* at *24. The court also found that "consumers have no opportunity to confuse defendant's services, goods, advertisement,

links or websites for those of plaintiff." *Id.* The reasoning in *Promatek*, however, reveals that the Seventh Circuit has recognized that initial interest confusion can arise even if consumers who are misled to a website are only briefly confused. *See Promatek*, 300 F.3d 808, 812 (7th Cir. 2002). As discussed above, Morningware alleges that given that Hearthware's advertisement does not mention Hearthware and the consumer who views the Hearthware advertisement searched for the term "Morningware," the advertisement could mislead consumer to believe that the link is associated with Hearthware. Accordingly, Morning sufficiently alleges initial interest confusion.

Morningware has sufficiently alleged a protectible trademark, use in commerce, and initial interest confusion pursuant to 15 U.S.C. § 1125(a)(1). Accordingly, the Court declines to dismiss Count I of the Complaint.

## II. Lanham Act – Product Disparagement

The Lanham Act provides, in relevant part, that any person who: "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act." 15 U.S.C. § 1125(a)(1)(B). "To establish a claim under the false or deceptive advertising prong of . . . the Lanham Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to

defendant or by a loss of goodwill associated with its products." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999).

Hearthware argues that Morningware fails to state a product disparagement claim because the allegedly conclusory statement "Why Buy an Imitation?" in Hearthware's advertisement does not imply that Morningware's product is an imitation or fake, and therefore Hearthware has made no false or misleading statement. (R. 43-1, Memorandum, pp. 10-11.) Hearthware further argues that Morningware fails to plead sufficient facts to demonstrate that the advertisement "actually deceives, or is likely to deceive a substantial segment of the advertisement's audience." (R. 43-1, Memorandum, p. 11.)

In its Complaint, however, Morningware alleges that Hearthware's "Why Buy an Imitation?" statement "falsely asserts product superiority specifically over [Morningware]'s products," that Hearthware made the statement in commerce in the context of commercial advertising, that the statement misleads and confuses consumers into believing Morningware's products are inferior or fakes, which Morningware alleges they are not, that Hearthware intended the statement to divert consumers from the Morningware website to Hearthware's website, that Hearthware is injuring Morningware's goodwill and reputation, and that Morningware has suffered damages as a result of Hearthware's actions. (R. 1-1, Complaint, ¶¶ 27-37, 45-50.)

By alleging that the text of Hearthware's advertisement that appears after a consumer has searched for the term "Morningware" will lead consumers to incorrectly believe Morningware's products are inferior or fake, Morningware has sufficiently pled is claim for product disparagement pursuant to 15 U.S.C. § 1125(a)(1)(B). *See, e.g., Foboha GmbH v. Gram Tech.*, 2008 U.S. Dist. LEXIS 82933 (N.D. Ill. Oct. 15, 2008) (motion to dismiss Lanham Act product disparagement claim denied where plaintiff sufficiently alleged that statement at issue was false

or misleading). *See also Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992) (whether a statement is false or misleading under § 43(a) [15 U.S.C. § 1125(a)] is a question of fact). Accordingly, the Court declines to dismiss Count II of the Complaint.

## III. State Law Claims

### A. Illinois Deceptive Trade Practices Act and Common Law Unfair Competition

The third and fourth causes of actions in Morningware's Complaint are claims for deceptive trade practices pursuant to the Illinois Deceptive Trade Practices Act (Count III) and common law unfair competition (Count IV). In their briefing on the Motion to Dismiss, Morningware and Hearthware agree that the Court's analysis governing Morningware's Lanham Act claims also applies to these claims. (R. 43-1, Memorandum, p. 11; R. 63-1, Morningware's Memorandum of Law in Opposition to Hearthware's Motion to Dismiss ("Opposition"), p. 9.)

"Where a plaintiff's factual allegations under the Illinois Uniform Deceptive Trade Practices Act also form the basis for plaintiff's claim under the Lanham Act, the legal inquiry is the same under both statutes. Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act." *SB Designs v. Reebok Int'l*, Ltd., 338 F. Supp. 2d 904, 914 (N.D. Ill. 2004) (citing *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir. 1983)). Furthermore, "[a] common law unfair competition claim need not be separately addressed since it is codified by the Deceptive Trade Practices Act." *MJ & Partners Restaurant Ltd. Pshp. v. Zadikoff*, 10 F. Supp. 2d 922, 929 (N.D. Ill. 1998). Accordingly, the Court's conclusion with respect to Morningware's Lanham Act claims dictates that Morningware has sufficiently pled Counts III and IV to withstand dismissal at this stage in the litigation.

### B. Commercial Disparagement

"To state a cause of action [for commercial disparagement], [plaintiff] must show that defendants made false and demeaning statements regarding the quality of [defendants'] goods and services." *Schivarelli v. CBS, Inc.*, 333 Ill. App. 3d 755, 767, 776 N.E.2d 693 (Ill. App. Ct. 2002). Hearthware argues that Morningware has failed to state a claim for commercial disparagement under Illinois law because "Morningware has failed to demonstrate that Hearthware has disparaged Morningware's goods by false or misleading representations of fact, or that Hearthware has even made a representation of fact as to Morningware's goods" and because "Morningware has failed to make the requisite showing of malice to sustain this claim." (R. 43-1, Memorandum, p. 12.)[1] Morningware, however, sufficiently alleges that Hearthware's statement in its "Why Buy and Imitation?" advertisement disparages Morningware's products by implying that its products are "fakes" or imitations, and therefore "inferior in quality." (R. 1-1, Complaint, ¶¶ 63-64.) Indeed, Morningware specifically alleges that "the topmost placement of Hearthware's website . . . in the search results for keywords "morningware" and "morning ware" coupled with the statement . . . 'Why Buy an Imitation?' . . . falsely asserts product superiority specifically over [Morningware]'s products, which misleads and/or confuses consumers into believing that [Morningware]'s products are inferior to Hearthware's because they are 'Imitations,' and thus fakes, of Hearthware's products, which they are not." *Id.* at ¶ 30 (emphasis omitted).

---

[1] As other courts in this district have noted, "[a]lthough there is some dispute over whether a claim for commercial disparagement remains viable in Illinois, the court assumes for purposes of this motion that a disparagement claim is still actionable." *Conseco Group Risk Mgmt. Co. v. Ahrens Fin. Sys.*, 2001 U.S. Dist. LEXIS 2306 (N.D. Ill. Mar. 5, 2001). *See also Cohabaco Cigar Co. v. United States Tobacco Co.*, 1998 U.S. Dist. LEXIS 17472 (N.D. Ill. Oct. 29, 1998) (recognizing a claim for commercial disparagement under Illinois law as a viable claim because several Illinois appellate divisions recognize the claim and the Illinois Supreme Court has yet to rule on the viability of the claim).

Moreover, it is unclear whether a claim for commercial disparagement under Illinois law requires a showing of malice as Hearthware argues. As reflected by the *Schivarelli* case, neither state nor federal cases regarding commercial disparagement under Illinois law subsequent to the 1995 case cited in Hearthware's brief appear to require a plaintiff to plead malice when alleging a claim of commercial disparagement. *See, e.g., DSC Logistics, Inc. v. Innovative Movements, Inc.*, 2004 U.S. Dist. LEXIS 1412 (N.D. Ill. Feb. 4, 2004) ("To state a claim for commercial disparagement, a plaintiff must allege that defendant made false and demeaning statements about the quality of plaintiff's goods or services.") (applying Illinois law); *Flanders Diamond USA, Inc. v. Nat'l Diamond Syndicate, Inc.*, 2002 U.S. Dist. LEXIS 23129 (N.D. Ill. Nov. 27, 2002) ("commercial disparagement claim requires plaintiff to show that defendant made false and demeaning statements regarding plaintiff's goods and services") (applying Illinois law); *Donnelley Mktg. v. Sullivan*, 2002 U.S. Dist. LEXIS 3320 (N.D. Ill. Feb. 27, 2002) ("in order to claim disparagement, [plaintiff] must argue that the statements contained in [defendant]'s letter disparaged the quality of its services"); *Barry Harlem Corp. v. Kraff*, 273 Ill. App. 3d 388, 396 (Ill. App. Ct. 1995) ("To state a cause of action [for commercial disparagement], plaintiff must show that defendant made false and demeaning statements regarding the quality of another's goods and services.").

Moreover, even if the Court were to find that Illinois law requires Morningware to plead malice, Hearthware posits in its Memorandum that its commercial disparagement claim is based on the same statements as its Lanham Act product disparagement claim. (R. 43-1, Memorandum, p. 12.) In its Complaint, in support of its claim for product disparagement pursuant to the Lanham Act, Morningware alleges that Hearthware's conduct in making the disparaging statements were "willful, wanton, reckless, and in total disregard for

[Morningware]'s rights." (R. 1-1, Complaint, ¶ 49.) Accordingly, even if Illinois law requires an allegation of malice, Morningware's Complaint contains allegations sufficient to withstand a 12(b)(6) motion to dismiss. *See, e.g., Cohabaco Cigar Co. v. United States Tobacco Co.*, 1998 U.S. Dist. LEXIS 17472 (N.D. Ill. Oct. 29, 1998) ("We reject [defendant]'s assertion that [plaintiff] failed to plead malice [in support of its commercial disparagement claim]. Paragraph 99 of [plaintiff]'s complaint clearly alleges the actionable statements "were made by [defendant] intentionally, wilfully, wantonly, recklessly and/or maliciously.").

Because Morningware has pled that Hearthware made a false and demeaning statement regarding Morningware's goods, the Court declines to dismiss Count V of the Complaint.

## CONCLUSION

For the foregoing reasons, the Court denies Hearthware's Motion to Dismiss.

DATED: November 16, 2009        ENTERED

                                                  _____
                                                  AMY J. ST. EVE
                                                  United States District Court Judge