# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MORNINGWARE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 09 C 4348 |
| HEARTHWARE HOME | ) | |
| PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| -------------------------------------------------------- | ) | |
| | ) | |
| IBC-HEARTHWARE, INC. | ) | |
| D/B/A HEARTHWARE HOME | ) | |
| PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Consolidated |
| v. | ) | |
| | ) | |
| MORNINGWARE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On July 20, 2009, Plaintiff Morningware, Inc. ("Morningware"), filed its Complaint

against Hearthware Home Products, Inc. ("Hearthware"), alleging that Hearthware had

commercially disparaged Morningware's counter-top oven, had committed the common-law tort

of unfair competition, and had violated the Deceptive Trade Practices Act of Illinois, as well as

the unfair-competition and product-disparagement provisions of the federal Lanham Act. (R. 1.)

Separately, Hearthware brought an action against Morningware alleging that the latter had

infringed U.S. Patent No. 6,201,217 ("the '217 Patent"). (*IBC-Hearthware, Inc. v.*

*Morningware, Inc.*, No. 09-CV-4903 (N.D. Ill.) (R. 1).) The Court consolidated both cases on

August 26, 2009. (*Id.* (R. 19).) Morningware filed an Amended Complaint on November 4,

2011. (R. 244, First Am. Compl. ("Complaint").) Before the Court are the following:

> 1) Morningware's motion for summary judgment on Counts I through V of its First Amended Complaint (R. 279);

> 2) Hearthware's cross-motion for summary judgment on Counts I through V of Morningware's First Amended Complaint (R. 317);

> 3) Morningware's motion to strike the affidavit of James H. Nelems (R. 308); and

> 4) Morningware's motion to exclude the Vanderhart Rebuttal Report and Documents Produced After the Close of Discovery (R. 309).[1]

For the following reasons, the Court denies Morningware's motion for summary

judgment; denies Hearthware's cross-motion for summary judgment; grants Morningware's

motion to strike Mr. Nelems' affidavit; and denies, without prejudice, Morningware's motion to

exclude Dr. Vanderhart's rebuttal report and documents produced after the close of discovery.

## BACKGROUND

I.     **Northern District of Illinois Local Rule 56.1**

"For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a

critical, and required, component of a litigant's response to a motion for summary judgment.

---

[1] Also pending before the Court are four additional motions for summary judgment relating to Hearthware's patent claims: 1) Morningware's motion for summary judgment that the '217 Patent is unenforceable due to inequitable conduct (R. 287); 2) Morningware's motion for summary judgment of invalidity of claim 3 of the '217 Patent (R. 291); 3) Morningware's motion for summary judgment of non-infringement of claim 3 of the '217 Patent (R. 299); and 4) Morningware's motion for summary judgment on Hearthware's third and fifth through eighth claims for relief in its First Amended Counterclaims (R. 301). The Court will address these motions in separate orders.

The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir. 2012). Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). "The Rule is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted).

Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). Pursuant to the Local Rules, the Court will not consider any additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) response, but must rely on the nonmovant's Local Rule 56.1(b)(3)(C) statement of additional facts. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). The Court disregards Rule 56.1 statements and responses that do not cite to specific portions of the record, as well as those that contain factual or legal argument. *See Cracco*, 559 F.3d at 632 ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner

dictated by the rule, those facts are deemed admitted for purposes of the motion."); *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts did [] not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"); *Bordelon*, 233 F.3d at 528 (the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted"); *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed.").

## II.     The Parties Failed to Comply with Local Rule 56.1

The parites' Local Rule 56.1 statements and responses contain significant problems. Several of Morningware's "statements of material facts," for example, are either unsupported by citations to the evidence, or they are not statements of fact at all, but rather legal argument or legal conclusions. (*See* R. 280, Morningware's Local Rule 56.1(a)(3) Statement of Facts in Support of its Mot. for Summ. J. ("Morningware's SOF") ¶¶ 7, 25, 27-41, 47, 49, 52-53.)  In addition, most of Hearthware's Local Rule 56.1(b)(3)(C) additional statements of material fact suffer from the same problems. (*See, e.g.*, R. 298, Hearthware's Local Rule 56.1 Statement of Additional Material Facts That Require Denial of Morningware's Mot. for Summ. J. ("Hearthware's Add'l SOF") ¶¶ 7-28, 30-37.)  As explained above, the purpose of Local Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments.  *See Cady*, 467 F.3d at 1060; *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("It is

4

inappropriate to make legal arguments in a Rule 56.1 statement of facts."). As such, the Court will not deem these "facts" as true unless the opposing party admits them.

Moreover, Hearthware's Local Rule 56.1(b)(3)(B) responses to Morningware's Local Rule 56.1(a)(3) statement of facts largely fail to comply with the Local Rule 56.1. Specifically, Local Rule 56.1(b)(3)(B) requires the opposing party "to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Cracco*, 559 F.3d at 632 (quoting N.D. Ill. R. 56.1(b)(3)(B)). Hearthware's responses do not cite specific, or even general, portions of the record or other evidence in support of its denials of Morningware's statements of fact. Instead, Hearthware states, in the majority of its denials, that because "Hearthware does not have personal knowledge of the facts presented," it denies the particular statement of fact. While such a response is permissible in an answer to a complaint, *see* Fed. R. Civ. P. 8(b)(5), it is an insufficient response to a Rule 56.1 statement of fact. *See* N.D. Ill. R. 56.1(b)(3)(B); *Cracco*, 559 F.3d at 632. As such, for the particular statements of fact that contain such a response from Hearthware, the Court deems Morningware's statements of fact as admitted for the purposes of its motion. *See Cracco*, 559 F.3d at 632; *see also Sojka*, 686 F.3d at 398 ("The obligation set forth in Local Rule 56.1 'is not a mere formality.' Rather, '[i]t follows from the obligation imposed by Fed. R. Civ. P. 56(e) on the party opposing summary judgment to identify specific facts that establish a genuine issue for trial.'") (quoting *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal citations omitted)).[2]

---

[2] Further, because the Court strikes Mr. James H. Nelems' affidavit, as explained below, the Court does not consider any statement of fact, or response thereto, in which Hearthware relies on Mr. Nelems' affidavit to dispute a statement of fact.

The parties also failed to cite to the Rule 56.1 Statements of Fact in their respective memoranda of law, and instead cited to the record directly. In memoranda of law in support of, or in opposition to, summary judgment, parties should cite to the specific statement(s) of fact in support of the argument, not to the record directly. *See LaSalvia v. City of Evanston*, 806 F. Supp. 2d 1043, 1046 (N.D. Ill. 2011) (citing *Malec v. Sanford*, 191 F.R.D. 581, 586 (N.D. Ill. 2000) (citations in the fact section should be to the 56.1(a) or (b) statement of facts only)).

## RELEVANT FACTS

The Court now turns to the facts relevant to Counts I-V of Morningware's Complaint. Hearthware is a corporation organized under Illinois law, with its principal place of business at 1795 North Butterfield Road, Libertyville, Illinois. (Hearthware's Add'l SOF ¶ 2.) Morningware is a corporation organized under Illinois law, with its principal place of business at 1699 Wall Street, Mount Prospect, Illinois. (*Id.* ¶ 3.) Morningware has only one employee. (*Id.* ¶ 29.) The Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121(a), 28 U.S.C. §§ 1331, 1338(b), and 1367(a). (*Id.* ¶ 4.) Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). (*Id.* ¶ 6.)

Morningware owns United States Trademark Registration No. 3,802,040, which issued on June 15, 2010, for "MORNINGWARE." (Morningware's SOF ¶ 4.) The registration is for use in small electric kitchen appliances–namely, infrared wave-producing convection ovens. (*Id.*) It has used this mark since at least 2002. (*Id.* ¶ 5.) Morningware markets, advertises, and sells counter-top electronic ovens in the United States, primarily via the internet, through its website at www.morningware.com, and through retail. (*Id.* ¶¶ 1-2.) Morningware also has promoted its Morningware Halogen/Halo Oven at tradeshows and through infomercials and

6

catalogs. (*Id.* ¶ 3.) Since at least January 2009, Morningware has used the designation "Halo" to identify its counter-top electronic ovens. (*Id.* ¶ 6.) Morningware has not given Hearthware permission to use the terms "Morningware" or "Halo." (*Id.* ¶ 8.)

Hearthware has participated in "pay-per-click" ("PPC") internet advertising through various search engine providers. (*Id.* ¶ 9.) Specifically, Hearthware purchased the keywords "Morningware" and "Morning Ware" from the Google, Yahoo!, and MSN search engines from October 14, 2008 through July 7, 2009. (*Id.* ¶ 10.) Hearthware uses keyword advertising with Yahoo! and Bing, through which Hearthware pays to have its ads displayed when a user searches for a word or phrase that Hearthware defines. (*Id.* ¶¶ 11-12.) Through this type of advertising, when a user searches the term "morningware," Hearthware's ad appears at the top of the search results. (*Id.* ¶ 13.) The ad contains a link to Hearthware's website, www.mynuwaveoven.com, and states that "[t]he Real NuWave® Oven Pro *Why Buy an Imitation*? 90-Day Gty." (*Id*. ¶¶ 13, 48.) When a user clicks on Hearthware's ad, the user is directed to Hearthware's website. (*Id.* ¶ 13.)

Hearthware has purchased or bid on the following keywords: morningware, morning ware, by morningware, halo oven by morningware, morningware halo oven, morningware halo oven reviews, halogen oven by morningware, morningware oven, morning ware oven, morningware halogen oven, morningware infrared oven, morning ware infrared oven, morningware infrared halogen oven, morningware convection oven, morningware reviews, morningware HO1200, morningware com, oven by morningware, halo trainer, halo halogen oven, halo infrared oven, halo convection oven, halo countertop oven, halo oven reviews. (*Id.* ¶ 14.) Hearthware has initiated approximately ten "campaigns" for Google AdWords, which

included ads that Hearthware created to display when a user searches keywords that Hearthware bid on.  (*Id.* ¶¶ 15-16.)

Before April 1, 2011, Hearthware lumped all of its AdWords campaigns under a single "Campaign No. 1."  (*Id.* ¶ 17.)  Hearthware used the "Morningware" mark and "Halo" in Campaign No. 1.  (*Id.*)  On April 1, 2011, Mr. David Kaplan began working at Hearthware.  (*Id.* ¶ 18.)  At some point thereafter, at Mr. Kaplan's direction, Hearthware began employing a "competitor campaign," which included using the "Morningware" mark and the "Halo" designation.  (*Id.* ¶ 19.)  Hearthware stopped this campaign when its counsel instructed Mr. Kaplan to do so.  (*Id.* ¶ 20.)  When it purchased these keywords, Hearthware knew that Morningware was a direct competitor.  (*Id.* ¶ 21.)

Hearthware's purchase and use of keywords is in "interstate commerce."  (*Id.* ¶ 26.) Hearthware bid on a total of twenty-five keywords that incorporated the "Morningware" and/or "Halo" designations, and Hearthware chose to bid on those specific keywords with the intent that the search engines would place Hearthware's ads in the search results.  (*Id.* ¶¶ 38-40.)

Morningware's expert, Mr. James Berger, conducted a survey on behalf of Morningware to determine whether Hearthware's use of Morningware's marks creates confusion among consumers.  (*Id.* ¶ 42.)  Mr. Berger concluded that 43% of persons surveyed believed they could purchase Morningware's oven from Hearthware's advertised website for its NuWave® Oven. (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth Grp., Inc*., 629 F.3d 697, 704-05 (7th Cir. 2011) (internal citations omitted).

## MORNINGWARE'S MOTIONS TO STRIKE AND EXCLUDE

Morningware has filed two ancillary motions that relate to the Court's consideration of its motion for summary judgment and Hearthware's cross-motion. The first is a motion to strike the affidavit of James H. Nelems, and the second is a motion to exclude the rebuttal report of Dr. Jennifer Vanderhart and documents Hearthware produced after the close of discovery upon which Dr. Vanderhart relies. (R. 308, 309.) For the following reasons, the Court grants Morningware's motion to strike and denies, without prejudice, Morningware's motion to exclude.

9

I.      **The Court Grants Morningware's Motion to Strike Mr. Nelems' Affidavit**

Federal Rule of Civil Procedure 37(c) provides that "[i]f a party fails to provide

information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use

that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the

failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Exclusion of the

untimely-disclosed evidence is automatic unless the non-compliant party meets its burden to

show that the untimely disclosure was substantially justified or harmless.  *Tribble v.*

*Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) ("Under Rule 37(c)(1), 'exclusion of

non-disclosed evidence is automatic and mandatory . . . unless non-disclosure was justified or

harmless.'") (quoting *Musser v. Gentiva Health Servs*., 356 F.3d 751, 758 (7th Cir. 2004));

*David v. Caterpillar, Inc*., 324 F.3d 851, 857 (7th Cir. 2003) ("the sanction of exclusion is

automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a)

was either justified for harmless").

The Court has broad discretion to determine whether a party's failure to comply with

Rule 26(e) is substantially justified or harmless.  *Keach v. U.S. Trust Co.*, 419 F.3d 626, 640 (7th

Cir. 2005); *David*, 324 F.3d at 857.  The following factors are relevant to the Court's

determination:

> (1) the prejudice or surprise to the party against whom the evidence is offered;
> (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to
> the trial; and (4) the bad faith or willfulness involved in not disclosing the
> evidence at an earlier date.

*Tribble*, 670 F.3d at 760 (citing *David*, 324 F.3d at 857).

This case has been pending for over three years.  The Court has repeatedly granted the

parties' requests for discovery extensions.  On December 8, 2011, the Court ordered the

following expert discovery schedule: identification of burden of proof experts by January 5, 2012, exchange of burden of proof expert reports by February 2, 2012, identification of rebuttal experts on February 16, 2012, and exchange of rebuttal expert reports by March 15, 2012. (R. 256.) On February 27, 2012, at the parties' request, the Court granted an extension of the expert discovery schedule as follows: exchange of burden of proof expert reports by March 15, 2012, identification of rebuttal experts by March 29, 2012, and exchange of rebuttal expert reports by April 26, 2012. (R. 275.) The Court also set a dispositive motion deadline of June 7, 2012. (*Id.*)

Morningware timely disclosed five experts, one of whom is Mr. James T. Berger. Mr. Berger's report details a survey that is relevant to Morningware's Lanham Act claims against Hearthware. Hearthware timely disclosed a damages expert and a patent expert. On April 6, 2012, one week after the Court's deadline, Hearthware re-identified its damages expert and its patent expert as rebuttal experts. Hearthware did not identify any additional experts.

On April 10, 2012, Morningware filed its motion for summary judgment on Counts I through V of its Complaint, in which it relies on Mr. Berger's report in support of its argument that Hearthware's conduct violated the Lanham Act. Specifically, Mr. Berger conducted a survey in which he attempted to determine whether Hearthware's advertisement caused confusion. Hearthware filed its opposition to Morningware's motion on June 2, 2012, attaching an affidavit from Mr. Nelems. Mr. Nelems' affidavit criticizes Mr. Berger's survey methodology and the conclusions in his report. Moreover, Hearthware relies upon Mr. Nelems' affidavit in support of its cross-motion for summary judgment. Prior to filing its response,

Hearthware did not identify Mr. Nelems as an expert, nor did it disclose any of his opinions. Hearthware never sought leave of Court to disclose Mr. Nelems after the Court-ordered deadline.

Hearthware's untimely disclosure of Mr. Nelems' expert opinions is neither harmless nor substantially justified. *See Tribble*, 670 F.3d at 760. Discovery has closed, and the time for filing dispositive motions has passed. Morningware represents that it moved for summary judgment based, at least in part, on the fact that Hearthware had not retained an expert to rebut Mr. Berger's opinions. Allowing Hearthware to rely on expert evidence disclosed for the first time in response to summary judgment would severely prejudice Morningware. It would require the Court to re-open discovery to allow Morningware to depose Mr. Nelems, and it would require the parties to re-assess their summary judgment strategy, and if necessary, re-file revised motions for summary judgment. The time and expense associated with those circumstances cannot be characterized as harmless.

Moreover, Hearthware has woefully failed to convince the Court that its untimely disclosure was "substantially justified." Hearthware argues that because it hired Mr. Nelems as a "consulting" expert, it did not need to identify him to Morningware or offer a report within the Court's expert discovery schedule. Hearthware's argument, however, reflects a gross misunderstanding regarding the difference between a consulting expert and a testifying expert, as well as the purpose of summary judgment. Consulting experts do not offer testimonial evidence during a litigation proceeding, and parties are therefore not entitled to discovery from consulting experts. *See* Fed. R. Civ. P. 26(b)(4)(D). Testifying experts, however, offer testimony that the parties use as evidence, and therefore the parties are entitled to discovery regarding these experts and their opinions. *See* Fed. R. Civ. P. 26(a)(2) and 26(b)(4)(A).

12

Although Hearthware initially may have intended Mr. Nelems to serve only as a consulting expert, when Mr. Nelems submitted a sworn affidavit (i.e., testimony) to the Court in connection with its opposition to summary judgment and its cross-motion for summary judgment, Mr. Nelems became a testifying expert.  That Hearthware submits the testimony in connection with summary judgment and not trial is of no consequence, given that the purpose of summary judgment is to determine, based on all of the evidence gleaned in discovery, whether any disputed issues of material fact exist for trial.  *See Johnson v. Cambridge Indus., Inc*., 325 F.3d 892, 901 (7th Cir. 2003) ("[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."); *see also Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (same).

Adopting Hearthware's reasoning would allow parties to hire "consulting" experts, fail to disclose them to opposing counsel, and then submit affidavits from those experts to block summary judgment (and in this case, to obtain summary judgment in the noncompliant party's favor).  Such a result is non-sensical and runs counter to the Federal Rules of Civil Procedure. Morningware's motion to strike is granted.  The Court will not consider Mr. Nelems' opinions in ruling on the summary judgment motions, and he may not testify at trial.

## II. The Court Denies, Without Prejudice, Morningware's Motion to Exclude Dr. Vanderhart's Rebuttal Report and Documents That Hearthware Produced After the Close of Discovery

The Court next considers Morningware's motion to exclude the rebuttal report of Dr. Jennifer Vanderhart and certain documents that Hearthware produced after the close of discovery.  Morningware argues that Dr. Vanderhart's rebuttal report, which Hearthware timely

disclosed, "improperly attempts to supplement her earlier Report . . . to include opinions on damages issues pertaining to Morningware's Lanham Act and related claims" even though her initial report did not opine on damages relating to those claims. (R. 309, Morningware's Mot. to Exclude at 1.) Morningware further argues that Dr. Vanderhart relied on documents that Hearthware refused to produce to Morningware during discovery and which Hearthware produced only after disclosing Dr. Vanderhart's report.

The parties agree that, in a Lanham Act case seeking lost profits, the plaintiff has the burden of proving the defendant's sales, and then the burden shifts to the defendant to prove its costs or other deductions. *See* 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."). Hearthware disclosed Dr. Vanderhart's initial report on March 16, 2012, in which she opined on Hearthware's damages arising out of its patent and Lanham Act claims against Morningware. (R. 309-1, Vanderhart Initial Report.) Dr. Vanderhart did not proffer any opinions on Morningware's Lanham Act claims against Hearthware in that report. Morningware disclosed a "report" from Mr. Jon Tepp, whom Morningware contends is not an expert, on March 14, 2012 regarding Hearthware's sales of its NuWave ovens. Morningware contends that because Mr. Tepp is not an expert, Dr. Vanderhart was not entitled to rebut his report. After Hearthware cross-moved to exclude Mr. Tepp's report, Morningware represented to the Court that it will not use Mr. Tepp's report, and Mr. Tepp will not testify at trial. Indeed, Morningware does not rely on Mr. Tepp's report in its summary judgment motion. As such, the Court denied Hearthware's cross-motion as moot. (R. 334.) Given that Mr. Tepp is no longer a witness in this case, and Morningware will not use his report at trial, Dr. Vanderhart's rebuttal opinions on

14

Morningware's Lanham Act claims appear unnecessary. Accordingly, the Court denies, without prejudice, Morningware's motion to exclude.

Dr. Vanderhart's contested opinion is not material to the pending motions for summary judgment, and thus the Court does not consider it. The parties should meet and confer after receiving this Order to determine whether Hearthware intends to offer Dr. Vanderhart's rebuttal opinions at trial. If necessary, Morningware may re-file its motion to exclude before trial.[3]

### MORNINGWARE'S MOTION FOR SUMMARY JUDGMENT ON COUNTS I-V OF ITS FIRST AMENDED COMPLAINT AND HEARTHWARE'S CROSS-MOTION FOR SUMMARY JUDGMENT ON THE SAME COUNTS

In its Complaint, Morningware asserts the following claims against Hearthware: unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) (Count I); product disparagement under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count II); violation of the Illinois Deceptive Trade Practices Act, 815 ILCS 510/2 ("the Illinois UDTPA") (Count III); common law unfair competition (Count IV); and common law commercial disparagement (Count V).[4] (R. 244, First Am. Compl.) Morningware has moved for summary judgment on all five counts, and Hearthware has cross-moved for summary judgment on the same counts.

---

[3] The Court cannot discern from the parties' briefing when Hearthware produced the documentation upon which Dr. Vanderhart relies. If Morningware re-files its motion to exclude at a later time, the parties should advise the Court of the specific dates on which Hearthware produced that information and whether Morningware had the opportunity to depose Dr. Vanderhart regarding those documents.

[4] Morningware also has asserted additional counterclaims against Hearthware, including declaration of non-infringement of United States Patent No. 6,201,217 ("the '217 Patent") (Count VI); declaration of invalidity of the '217 Patent (Count VII); declaration of unenforceability of the '217 Patent (Count VIII); tortious interference with prospective economic advantage (Count IX); and exceptional case (Count X). (*See* R. 243, Morningware, Inc.'s First Amended Answer to Hearthware's First Amended Counterclaims and Morningware's Second Amended Counterclaims.)

I.    **The Court Denies Both Parties' Motions for Summary Judgment on Count I - False Representation of Origin Under 15 U.S.C. § 1125(a)(1)(A)**

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), provides that

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).  To prevail on its Lanham Act claim, Morningware must prove "(1) that [Morningware] owns a protectible trademark, and (2) that use of this mark by [Hearthware] is likely to cause confusion among customers."  *Morningware, Inc. v. Hearthware Home Prods., Inc.*, 673 F. Supp. 2d 630, 634 (N.D. Ill. 2009) (quoting *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008)).  Morningware must also prove that Hearthware used the marks in interstate commerce.  *See id.* at 635.

There is no genuine dispute that the "Morningware" mark and the "Halo" designation are protectible trademarks (Morningware's SOF ¶ 4-6), or that Hearthware used these marks in interstate commerce.  (*Id.* ¶¶ 9-21, 26.)  Accordingly, the Court turns to the likelihood of confusion element.

As the Seventh Circuit teaches, "[w]hether consumers are likely to be confused about the origin of a defendant's products or services is ultimately a question of fact" that may be resolved on a motion for summary judgment "only 'if the evidence is so one-sided that there can be no

doubt about how the question should be answered.'" *Autozone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008) (quoting *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1167 (7th Cir. 1986) and *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 627 (7th Cir. 2001)). "'In assessing the likelihood of consumer confusion, [courts] consider (1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use of the products, (4) the degree of care likely to be exercised by consumers, (5) the strength of the plaintiff's marks, (6) any evidence of actual confusion, and (7) the defendant's intent to palm off its goods as those of the plaintiff's.'" *Morningware*, 673 F. Supp. 2d at 636 (quoting *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002)). Although "[n]one of these factors are dispositive and the proper weight given to each will vary in each case," the "similarity of the marks, the defendant's intent, and evidence of actual confusion are of particular importance." *Promatek*, 300 F.3d at 812 (citing *Ty, Inc. v. Jones Grp.*, 237 F.3d 891, 897-98 (7th Cir. 2001)).

While evidence exists in this case to support a finding of a likelihood of confusion, Morningware has failed to meet its heavy burden of showing that "the evidence is so one-sided that there can be no doubt about how the questions should be answered." *See Autozone*, 543 F.3d at 929. As such, the Court denies both parties' motion for summary judgment.

Morningware asserts a theory of "initial interest confusion," which the Seventh Circuit has held is actionable under the Lanham Act. *See Promatek*, 300 F.3d at 812. Initial interest confusion "occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated." *Id.* In *Promatek*, the defendant diverted internet consumers to its website by placing the plaintiff's

trademark in the defendant's website as a metatag.[5] *Id.* The court held that this had the effect of diverting the plaintiff's goodwill, even though consumers may have been "only briefly confused." *Id.* ("that confusion as to the source of a product or service is eventually dispelled does not eliminate the trademark infringement which has already occurred") (quoting *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 n.2 (7th Cir. 1990)). "What is important is not the duration of the confusion, it is the misappropriation of [the plaintiff's] goodwill. [The defendant] cannot unring the bell." *Id.* at 812-13. Relying on *Promatek*, Morningware argues that consumers were confused when, upon searching for Plaintiff's trademark or a variation thereof, Hearthware's advertisement for its counter-top oven displayed in the search results.

Hearthware does not challenge Morningware's argument with respect to the first, second, and third likelihood of confusion factors. Specifically, there is no genuine dispute of material fact that Hearthware used Morningware's actual marks, which Morningware uses to advertise its counter-top ovens, in connection with the advertising and sale of Hearthware's NuWave® counter-top oven by purchasing those keywords that included Morningware's trademarks. (Morningware's SOF ¶¶ 9-13, 48.) Moreover, the marks are not only similar, but identical, and the products are very similar. The third factor, the area and manner of concurrent use of the products, also weighs in favor of a finding of confusion because both Morningware and Hearthware sell their respective counter-top ovens through the internet. (*Id.* ¶¶ 1-2, 13, 48.) The

---

[5] As the *Promatek* court explained, "[m]etatags are HTML [HyperText Markup Langue] code intended to describe the contents of a web site . . . . The more often a term appears in the metatags and in the text of the web page, the more likely it is that the web page will be 'hit' in a search for that keyword and the higher on the list of 'hits' the webpage will appear." 300 F.3d at 811 (quoting *Brookfield Comm'cns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999)).

seventh factor–Hearthware's intent–is also largely undisputed.  Hearthware bid on a total of twenty-five keywords that incorporated the "Morningware" and/or "Halo" designations. Hearthware chose to bid on those specific keywords with the intent that the search engines would place Hearthware's ads in the search results and knowing that Morningware is a direct competitor.[6]  (*Id.* ¶¶ 21, 38-40.)  These facts strongly support a finding that Hearthware intended to divert consumers to its website.

The fourth factor – the degree of care likely to be exercised by customers – is less clear. Relying on *Promatek*, Morningware argues that the degree of care is "generally low" when a customer searches for a product on the internet, and therefore this factor weighs in favor of Morningware.  (R. 279, Morningware's Mot. at 9.)  Morningware further submits that the degree of care that a consumer uses when he or she decides on which links to click after the search results have been displayed on the webpage is the relevant consideration, as opposed to the degree of care that a consumer uses when actually purchasing the product.  (*Id.*; R. 329, Morningware's Reply at 6.)  Hearthware, on the other hand, focuses on the degree of care that a consumer uses when actually purchasing the product, and argues that because the ovens at issue cost between $80 and $100, consumers exercise a higher degree of care than with products that only cost a few dollars.[7]  (R. 295, Hearthware's Resp. at 9-10); *see Autozone*, 543 F.3d at 932

---

[6]  Hearthware suggests that it did not have any intent to confuse customers, arguing that it "makes little corporate sense" for it to "use the ad words of a single-employee company a fraction of its own size with a fraction of its own market."  (R. 295, Hearthware's Memorandum in Opposition to Morningware's Mot. for Summ. J. ("Hearthware's Resp.") at 10-11.)  This, however, is of little significance here, where Hearthware has admitted to purchasing key words encompassing Morningware's protected marks.

[7]  Neither party submitted evidence regarding the price point of their respective counter-top ovens.

19

("[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases") (citation omitted).

Because Morningware asserts an initial interest confusion theory in this case, the relevant focus is the degree of care a consumer uses when deciding on which link to click after the search results are displayed on the webpage, as that is the point at which consumer confusion can occur. *See Promatek*, 300 F.3d at 812. This focus, however, does not mean that the nature of the goods, including the cost, as well as the relevant consumers' characteristics, are irrelevant to the degree of care factor. *See, e.g., Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1152 (9th Cir. 2011) ("The nature of the goods and the type of consumer is highly relevant to determining the likelihood of confusion in the keyword advertising context. . . . [T]he degree of care analysis cannot begin and end at the marketing channel.") (quoting *Brookfield Communications*, 174 F.3d at 1060).[8]

In *Network Automation*, a recent case involving keyword advertising over the internet, the Ninth Circuit held that the district court erred in determining that the degree of care factor favored a likelihood of confusion finding. 638 F.3d at 1153. In connection with the plaintiff's motion for a preliminary injunction, the district court, relying on the Ninth Circuit's conclusion in *Brookfield Communications*, had determined that the degree of care factor weighed in favor of a likelihood of confusion because "there is generally a low degree of care exercised by Internet consumers." *Id.* at 1152. The Ninth Circuit explained that while this conclusion may have been

---

[8] In *Promatek*, the Seventh Circuit followed the Ninth Circuit's reasoning in *Brookfield Communications* regarding the degree of care factor in initial interest confusion cases involving the internet. *See Promatek*, 300 F.3d at 812-13.

accurate at the time it decided *Brookfield Communications*, it "suspect[s] that there are many

contexts in which it no longer holds true" due to consumers' evolving sophistication with respect

to internet commerce. *Id.* at 1152-53 ("We have recently acknowledged that the default degree

of consumer care is becoming more heightened as the novelty of the Internet evaporates and

online commerce becomes commonplace."). Accordingly, "the degree of care analysis cannot

begin and end at the marketing channel. We still must consider the nature and cost of the goods,

and whether 'the products being sold are marketed primarily to expert buyers.'" *Id.* at 1152

(quoting *Brookfield Communications*, 174 F.3d at 1060).[9]

The Court agrees with the observation and reasoning in *Network Automation*, which is

not contrary to or inconsistent with the Seventh Circuit's decision in *Promatek*. Indeed, statistics

from the United States Department of Commerce and the United States Census Bureau support

this observation. *See Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (taking judicial notice

of information found on the website of a government agency); *Trundle v. Astrue*, No. 09-CV-

02058, 2010 WL 5421418, at *11 n.10 (E.D. Cal. Dec. 20, 2010) (taking judicial notice of the

United States Department of Labor statistics) (citing cases). In 2000, for example, online

business-to-consumer retail "shipments, sales, and revenues" equaled $28 billion. *See United*

States Dep't of Commerce E-Stats Report for 2001, issued March 19, 2003, *available at*

http://www.census.gov//econ/estats/2001/2001estatstext.pdf. In 2002, the year in which the

Seventh Circuit issued *Promatek*, that figure rose to $44 billion. *See* United States Dep't of

Commerce E-Stats Report for 2002, issued April 15, 2004, *available at*

---

[9] Significantly, the Seventh Circuit in *Promatek* cited *Brookfield Communications* in its discussion of the degree of care factor in initial interest confusion cases. 300 F.3d at 812-13.

21

http://www.census.gov//econ/estats/2002/2002finaltext.pdf. By 2010, that number had nearly

quadrupled to $169 billion. *See* United States Dep't of Commerce E-Stats Report for 2010,

issued on May 10, 2012, *available at* www.census.gov/econ/estats/2010/2010reportfinal.pdf.

Given the ever-increasing commonplace of consumers searching for and purchasing goods

online, the fact that this case involves a theory of initial interest confusion in keyword

advertising does not, without more, necessitate a finding that consumers exercise a low degree of

care. The additional factors that the *Network Automation* court discussed – i.e., the nature and

cost of the goods, as well as the characteristics of the target consumers – are relevant.

Morningware has not sufficiently addressed or proven these additional factors. The degree of

care factor, therefore, does not weigh clearly in favor of Morningware or Hearthware.

The fifth factor – the strength of Morningware's marks – favors a likelihood of confusion

finding, but not overwhemingly so. A mark's "strength" refers to its distinctiveness, "meaning

its propensity to identify the products or services sold as emanating from a particular source."

*CAE, Inc. v. Clean Air Eng'g, Inc*., 267 F.3d 660, 684 (7th Cir. 2001). "The stronger the mark,

the more likely it is that encroachment on it will produce confusion." *Autozone*, 543 F.3d at 933

(quoting 2 McCarthy § 11.73, at 11-169 to 170 (2008)). In determining the strength of the mark,

courts consider, among other factors, the uniqueness of the mark, the length of use of the mark,

the sales associated with the mark, and advertising expenditures connected with the mark. *See*

*CAE*, 267 F.3d at 684.

The record contains sufficient evidence from which a jury could find this factor weighs in

favor of Morningware. The terms "Morningware" and "Halo," for example, are arbitrary marks

because they are not necessary to the description of a counter-top oven, and therefore they are

unique marks. *See Sullivan v. CBS Corp.*, 385 F.3d 772, 776 (7th Cir. 2004) (explaining that the word "'survivor' when used as a band name is arbitrary because there is nothing about the word which is necessary to the description of a band").[10]  Moreover, the "Morningware" mark has been registered since 2010, and Morningware has used that mark on counter-top ovens for almost ten years.  (Morningware's SOF ¶¶ 4-6.)  Other evidence in the record (and the lack thereof) however, cuts against a finding of a strong mark.  Morningware, for example, is a one-person company.  (Hearthware's Add'l SOF ¶ 29.)  Moreover, Morningware has not provided any evidence of the economic strength of its marks, such as the frequency with which it advertises the marks or the amount of money it spends to advertise them.[11]  *Cf. Autozone*, 543 F.3d at 933 (noting that there was sufficient evidence to support the conclusion that the Autozone mark has economic and marketing strength where it "is displayed prominently on more than 3,000 stores nationwide and it has been the subject of hundreds of millions of dollars' worth of advertising since 1987"); *see also Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F. Supp. 2d 811, 832 (C.D. Ill. 2009) ("evidence of the frequency of a mark's display and the amount of advertising dollars used to promote the mark are relevant factors when determining a mark's strength") (citing *Autozone*, 543 F.3d at 933)).

---

[10]  "Trademarks are classified in one of four categories–fanciful, arbitrary, descriptive, and generic.  The amount of protection inherently available tends to increase from generic to fanciful.  Generic words are entitled to no protection, whereas fanciful terms are usually entitled to strong protection." *Id.*

[11]  Hearthware argues that because Morningware's revenues are much lower than Hearthware's, Morningware's marks are not strong.  In support, Hearthware relies on Dr. Vanderhart's conclusions, which it did not include in its statement of additional facts.  As such, the Court cannot discern whether Morningware disputes this "evidence."  The Court, accordingly, does not place any merit on Hearthware's argument.

The same is true for actual confusion, the sixth factor. In support of its assertion that Hearthware's use of Morningware's trademark has caused actual consumer confusion, Morningware submits a survey that its expert, Mr. Berger, conducted. Based on his survey, Mr. Berger concluded that 43% of persons surveyed believed they could purchase Morningware's oven from Hearthware's advertised website for its NuWave® Oven. (Morningware's SOF ¶ 42.) Hearthware does not present any expert testimony to rebut Mr. Berger's conclusions or to contest the methodology he employed in his survey.

Hearthware, however, criticizes Mr. Berger's survey on several independent grounds. It argues, for example, that Mr. Berger omitted consumers from the Southern portion of the United States from its survey, despite stating that he wanted a national sampling presence. (R. 360, Hearthware's Sur-Reply at 8.) Hearthware also argues that Mr. Berger's survey asked the respondents to make several inappropriate factual assumptions for which he could not provide an explanation. (*Id.*) Additionally, Hearthware submits that Mr. Berger asked leading questions of survey respondents and did not code or quantify the respondents' answers to the first five questions of the survey. (*Id.* at 8-10.) Hearthware further argues that Mr. Berger's survey is flawed because it does not account for non-Google AdWords campaigns, such as Bing, Yahoo, or Safari. (*Id.* at 10.)

Morningware, as the plaintiff, bears the burden of proving actual confusion by a preponderance of the evidence, and it relies solely on Mr. Berger's testimony to do so. Although, as explained above, Hearthware cannot offer Mr. Nelems as a witness at trial to rebut Mr. Berger's testimony, Hearthware may still cross-examine Mr. Berger at trial. In this case, Hearthware's many criticisms of Mr. Berger's survey create issues of fact for the jury. *See*

*O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011) ("It is not for courts at summary judgment to weigh evidence or determine the credibility of [a witness's] testimony; we leave those tasks to factfinders.") (quoting *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)).  While Mr. Berger's survey opinions provide a sufficient evidentiary basis for a jury to conclude that Hearthware's conduct caused actual consumer confusion, a jury could also find that Mr. Berger's survey methodology was flawed and thus created inaccurate results.[12]  It is simply not the Court's province to weigh expert testimony at the summary judgment stage, particularly here, where the expert's testimony is critical to the actual confusion factor.  *See O'Leary*, 657 F.3d at 630; *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993) ("We have stated a number of times that the trial court's ultimate conclusion on the likelihood of confusion is a finding of fact.  Accordingly, a motion for summary judgment in trademark infringement cases must be approached with great caution.") (internal citation omitted).  As such, there is a genuine dispute of material fact as to whether Hearthware's conduct caused actual confusion.

Considering all of the above factors, neither party is entitled to summary judgment on Morningware's false representation of origin claim.  While Morningware has set forth evidence upon which a jury could find in its favor, it has not shown that the evidence is so "one-sided that there can be no doubt about how the question should be answered."  *Autozone*, 543 F.3d 923.  As

---

[12]  Although the absence of actual confusion does not preclude a finding of a likelihood of confusion, it is nevertheless a highly relevant favor.  *See Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 781 (N.D. Ill. 2011) ("[E]ven though actual confusion is one of the three factors upon which courts place particular emphasis, the absence of actual confusion is not fatal to an infringement claim.") (citing *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 960 (7th Cir. 1992) and *CAE, Inc*., 267 F.3d at 686).

such, the Court denies both parties' motions for summary judgment as to Count I of

Morningware's Complaint.

## II.    The Court Denies Both Parties' Motions for Summary Judgment on Count II - Product Disparagement Under 15 U.S.C. § 1125(a)(1)(B)

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), provides that

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

. . .

(B)  in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  As the Court has previously explained in this case, to establish this

claim, Morningware must prove "(1) a false statement of fact by [Hearthware] in a commercial

advertisement about its own or another's product; (2) the statement actually deceived or has the

tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it

is likely to influence the purchasing decision; (4) [Hearthware] caused its false statement to enter

interstate commerce; and (5) [Morningware] has been or is likely to be injured as a result of the

false statement, either by direct diversion of sales from itself to [Hearthware] or by a loss of

goodwill associated with its products."  *Morningware*, 673 F. Supp. 2d at 638 (quoting *Hot Wax,*

*Inc. v. Turtle Wax, Inc*., 191 F.3d 813, 820 (7th Cir. 1999)).  "In addition, to recover money

damages under the Act, [Morningware] must prove both actual damages and a causal link

between [Hearthware's] violation and those damages."  *Hot Wax*, 191 F.3d at 819-20.

Morningware argues that Hearthware's advertisement, which contained a link to Hearthware's website and stated "The Real NuWave® Oven Pro Why Buy an Imitation? 90-Day Gty," "misleads and/or confuses consumers into believing that Morningware's ovens are inferior to Hearthware's because they are imitations." (Morningware's Mot. at 12.) It is undisputed that Hearthware, in connection with its keyword advertising campaign, made the statement identified above. (Morningware's SOF ¶¶ 13, 48.) Issues of material fact exist, however, with respect to several of the elements of Morningware's claim, as explained in more detail below.

A false statement establishing liability under the Lanham Act "generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive customers." *Hot Wax*, 191 F.3d at 820; *see also LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 948 (N.D. Ill. 2009). If the statement is literally false, "the plaintiff need not show that the statement either actually deceived customers or was likely to do so." *Hot Wax*, 191 F.3d at 820. When a statement is literally true or ambiguous, "the plaintiff must prove that the statement is misleading in context by demonstrated actual consumer confusion." *Id.* Regardless of whether the theory is one of literal or implied falsity, "'whether a claim is either 'false' or 'misleading' is an issue of fact rather than law.'" *LG Elecs.*, 661 F. Supp. 2d at 948 (quoting *Mead Johnson & Co. v. Abbott Labs.*, 209 F.3d 1032, 1034 (7th Cir. 2000)). "It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive." *Id.* (quoting *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297-98 (2d Cir. 1992)).

Morningware does not argue, and has not set forth any evidence to prove, that Hearthware's statement is literally false. Instead, Morningware argues that Hearthware's statement "conveys a false impression and is misleading in context." (Morningware's Reply at 7.) To succeed on this implied falsity theory, Morningware must establish that a "statistically significant portion of the target audience received the implied message allegedly communicated by the challenged advertisement–without such proof, the plaintiff cannot establish injury arising from the advertiser's allegedly false message." *LG Elecs.*, 661 F. Supp. 2d at 950; *see also B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 972 (7th Cir. 1999) ("[W]here the statement is literally true or ambiguous, then the plaintiff is obliged to prove that the statement is 'misleading in context, as demonstrated by actual consumer confusion.'") (quoting *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1089 (7th Cir. 1994)). "[B]efore a court can consider the truth or falsity of an advertisement's message, 'it must first determine what message was actually conveyed to the viewing audience.'" *LG Elecs.*, 661 F. Supp. 2d at 950 (quoting *Johnson & Johnson*, 960 F.2d at 298). Because of the difficulty in obtaining this information from the consuming public, plaintiffs often present consumer surveys to prove this element. *Id.* ("Indeed, some courts have held that 'the success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey.'") (quoting *Johnson & Johnson*, 960 F.2d at 298).

Morningware relies on Mr. Berger's survey to establish that consumers received a misleading message from Hearthware's advertisement–namely, that Morningware's counter-top oven is an imitation of Hearthware's NuWave® Oven Pro. (*See* R. 279-1, Berger Report ¶ 15 ("many of the respondents were under the impression [that] the Nu Wave Oven Pro is an

authentic product while the Morningware product was a 'fake' or 'imitation'").)  Although

Morningware contends that Mr. Berger's conclusions are undisputed (Morningware's Mot.

at 12), that is not the case.  First, Morningware did not include any of Mr. Berger's opinions on

this issue in its Local Rule 56.1 Statement of Facts, and thus they are not undisputed.  *See Bobak*

*Sausage Co. v. A&J Seven Bridges, Inc.*, 805 F. Supp. 3d 503, 508 (N.D. Ill. 2011) ("Adherence

to Local Rule 56.1 gives the opposing party the opportunity to either admit or deny the statement

of fact, and to provide record support for either assertion.  By not following the rule, a party

injects facts into the case that have not been subject to the opposing side's scrutiny, nor

presented to the court for its review.").  Second, Hearthware vehemently disputes Mr. Berger's

survey methodology and conclusions in its brief.  Specifically, Hearthware argues that (1) Mr.

Berger's questions were suggestive and leading, (2) Mr. Berger failed to "code," or assign

categories of meaning to, the respondents' answers, and (3) Mr. Berger's report does not show

that Hearthware's statement deceived "a substantial segment of its audience" because Mr. Berger

did not quantify the results of the relevant survey question.[13]  (Morningware's Reply at 12-13.)

These disputes raise issues of fact for the jury.  See *LG Elecs.*, 661 F. Supp. 2d at 948 (whether

an advertisement conveys a misleading message is an issue of fact).  Because genuine disputes of

material fact exist as to whether Hearthware's advertisement conveys a misleading message to a

"statistically significant portion of the target audience," *see id.* at 950, summary judgment is not

appropriate.

---

[13]  Hearthware has not moved to exclude Mr. Berger's expert testimony on this issue pursuant to Federal Rule of Evidence 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Additionally, a genuine dispute of material fact exists as to whether the allegedly false statement is material to consumers' decisions to purchase the goods. "A claim is considered material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product.'" *LG Elecs. v. Whirlpool Corp*., No. 08 C 242, 2010 WL 2921633, at *2 (N.D. Ill. July 22, 2010) (quoting *Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992)).[14] Relatedly, a dispute of material fact exists as to whether Morningware has or is likely to suffer injury as a result of Hearthware's advertisement. *See LG Elecs*., 661 F. Supp. 2d at 950 (without proof that a "statistically significant portion of the target audience received the implied message allegedly communicated by the challenged advertisement," a plaintiff "cannot establish injury arising from the advertiser's allegedly false message"). Because disputes of material fact exist as to Morningware's false advertising claim, the Court denies both parties' motions for summary judgment.

### III. Morningware's State Law Claims

Both parties agree that Morningware's state law claims (violation of the Illinois UDTPA, common law unfair competition, and common law commercial disparagement) rise and fall with its Lanham Act claims. (Morningware's Mot. at 13; Hearthware's Resp. at 14-15); *see also Morningware*, 673 F. Supp. 2d at 639.[15] Because the Court denies both parties' motions for

---

[14] Although Morningware does not offer expert testimony on this issue, that does not require the Court to grant Hearthware's motion for summary judgment. *See LG Elecs U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3397358, at *13, n.2 (N.D. Ill. Aug. 24, 2010) ("Courts do not require that a party proffer expert testimony to establish that the subject of the false or misleading advertising was material to the consumer's decision to purchase the goods.") (citing cases).

[15] Although the Court's memorandum opinion and order regarding Hearthware's Rule 12(b)(6) motion to dismiss explained that Morningware's claims for unfair competition and

summary judgment on Morningware's Lanham Act claims, the Court also denies their motions for summary judgment on Morningware's state law claims.

## CONCLUSION

For the reasons explained above, the Court denies Morningware's motion for summary judgment on Counts I-V of its First Amended Complaint and Hearthware's cross motion for summary judgment on those same counts. The Court grants Morningware's motion to strike Mr. Nelems' affidavit, and denies, without prejudice, Morningware's motion to exclude Dr. Vanderhart's rebuttal report and documents that Hearthware produced after the close of discovery.

**Dated: August 27, 2012**

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**

---

violation of the Illinois UDPTA track its Lanham Act claims, the Court addressed Morningware's claim for commercial disparagement separately. *See Morningware,* 673 F. Supp. 2d at 639-40. Neither party, however, presents an argument regarding Morningware's claim for common law commercial disparagement that is independent of the Lanham Act arguments.