**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MORNINGWARE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HEARTHWARE HOME | ) | No. 09 C 4348 |
| PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ------------------------------------------------------- | ) | |
| | ) | |
| IBC-HEARTHWARE, INC. | ) | |
| D/B/A HEARTHWARE HOME | ) | |
| PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Consolidated |
| v. | ) | |
| | ) | |
| MORNINGWARE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On July 20, 2009, Plaintiff Morningware, Inc. ("Morningware"), filed its Complaint

against Hearthware Home Products, Inc. ("Hearthware"), alleging that Hearthware had

commercially disparaged Morningware's goods, had committed the common-law tort of unfair

competition, and had violated the Deceptive Trade Practices Act of Illinois, as well as the unfair-

competition and product-disparagement provisions of the Lanham Act. (R. 1.) Separately,

Hearthware brought an action against Morningware alleging that it had infringed U.S. Patent No.

6,201,217 ("the '217 Patent"). (*IBC-Hearthware, Inc. v. Morningware, Inc.*, No. 09-CV-4903 (N.D. Ill.) (R. 1).) The Court consolidated both cases on August 26, 2009. (*Id.* (R. 19).)

Since that time, both parties have amended their pleadings to assert additional claims and counterclaims against each other. At issue in this Memorandum Opinion and Order are the following: 1) Morningware's counterclaim against Hearthware for a declaration of noninfringement of the '217 Patent" (Count VI of Morningware's counterclaims); 2) Morningware's counterclaim for a declaration of invalidity of claim 3 of the '217 Patent (Count VII of Morningware's counterclaims); and 3) Morningware's counterclaim for a declaration of unenforceability of the '217 Patent due to inequitable conduct (Count VIII of Morningware's counterclaims). Morningware has moved for summary judgment on all three claims. For the following reasons, the Court denies Morningware's motions.[1]

## BACKGROUND

### I. Northern District of Illinois Local Rule 56.1

"For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment. The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012). Local

---

[1] Morningware also moved for summary judgment on Counts I-V of its Complaint, which the Court denied in a separate Memorandum Opinion and Order. *See Morningware, Inc. v. Hearthware Home Prods., Inc.*, No. 09-4348, 2012 WL 3721350 (N.D. Ill. Aug. 27, 2012). In addition, Morningware moved for summary judgment on Counts III and V-VIII of Hearthware's counterclaims, which the Court granted in part and denied in part in a separate Memorandum Opinion and Order. *See Morningware, Inc. v. Hearthware Home Prods., Inc.*, No. 09-cv-4348, 2012 WL 3835825 (N.D. Ill. Sept. 4, 2012).

Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). "The Rule is designed, in part, to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation and internal quotation marks omitted).

Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to a judgment as a matter of law." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). Pursuant to the Local Rules, the Court will not consider any additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) response, but must rely on the nonmovant's Local Rule 56.1(b)(3)(C) statement of additional facts. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). The Court disregards Rule 56.1 statements and responses that do not cite to specific portions of the record, as well as those that contain factual or legal argument. *See Cracco*, 559 F.3d at 632 ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion."); *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (noting that the party's statement of material facts "did not comply with

3

Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"); *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed."); *Bordelon*, 233 F.3d at 528 (the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted").

## II.    The Parties Failed to Comply with Local Rule 56.1

As was the case with Morningware's previous motions for summary judgment in this case, both parties' Local Rule 56.1 statements contain significant problems. Several of Morningware's "statements of material facts" are either unsupported by any citation to the evidence or they are not statements of fact at all, but rather legal argument or legal conclusions. In addition, many of Hearthware's Local Rule 56.1(b)(3)(C) additional statements of material fact fail to comply with the local rules because they contain improper argument and legal conclusions, and many do not contain citations to evidence in support of the asserted statements. As explained above, the purpose of Local Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. *See Sojka*, 686 F.3d at 398; *Cady*, 467 F.3d at 1060; *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts."). As such, the Court will not deem these "facts" as true.

As with the parties' previous statements of fact submitted to the Court in this matter, it appears that the parties simply cut and pasted portions of their briefs into their Local Rule 56.1 statements of fact and responses thereto. This is not only impermissible, it also does not assist the Court in deciding the motions. *See Dal Pozzo v. Basic Machinery Co., Inc.*, 463 F.3d 609, 613 (7th Cir. 2006) ("An advocate's job is to make it easy for the court to rule in his client's favor . . . ."). As a result of the parties' failure to comply with Rule 56.1, deciphering the material facts at issue in this complicated patent case has been an onerous task.

## RELEVANT FACTS

### I. The Parties and the Court's Jurisdiction

Hearthware is a corporation organized under Illinois law with its principal place of business in Libertyville, Illinois. (R. 343, Hearthware's Noninfringement Add'l SOF ¶ 2.) Morningware is a corporation organized under Illinois law with its principal place of business in Mount Prospect, Illinois. (*Id.* ¶ 3.) This Court has subject matter jurisdiction over Hearthware's patent claims under 28 U.S.C. § 1338(a). (*Id.* ¶ 4.) Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). (*Id.* ¶ 6.)

### II. Facts Relevant to Morningware's Noninfringement Motion for Summary Judgment

#### A. Hearthware's '217 Patent

At issue in this case is the '217 Patent, entitled "Counter-Top Electric Cooker." (R. 321-2, '217 Patent.) The '217 Patent issued on March 13, 2001, and it lists Jung S. Moon, Ron Liu, and Alan R. Kelley as the inventors. (*Id.*) Mr. Moon is Hearthware's Chief Executive Officer. (*See* R. 232, Oct. 11, 2011 Order.) One of the stated objectives of the '217 Patent is "to provide a countertop electric oven that minimizes the risk of heating housing components to a

5

point where the components can be damages or where a user cannot comfortably handle the housings during operation or soon after operation has been terminated." (Hearthware's Invalidity SOF ¶ 14; R. 337-2, '217 Patent, col. 1, l. 66 through col. 2, l. 4.)

Claim 3 of the '217 Patent discloses:

An electric oven for cooking food, the oven comprising:

> a cooking enclosure including an upper surface with an opening therein; and
>
> a power head detachably connected to the cooking enclosure and including
>
>> a heating unit extending into the cooking enclosure through said opening,
>>
>> a fan chamber positioned above the cooking enclosure and the heating unit,
>>
>> a fan mounted in the fan chamber to create a cooling air flow through the fan chamber,
>>
>> a plurality of air inlets to the fan chamber to allow said cooling air flow into the fan chamber, and
>>
>> a cooling manifold surrounding said opening and facing said upper surface outside of said cooking enclosure, the cooling manifold in fluid communication with the fan chamber and including a plurality of air outlets arranged to direct the cooling air flow from the fan chamber toward the upper surface of the cooking enclosure to cool the upper surface,
>
> wherein said heating unit is spaced from said opening to define a hot gas vent surrounding said heating unit and located between said heating unit and said air outlets to vent hot gas from the inside of the cooking enclosure for mixture with said cooling air flow from said air outlets.

(*Id.*, col. 8, l. 51 through col. 9, l. 10.)  The Court has construed certain terms in claim 3 as follows:[2]

| Text of Claim 3 | Court's Construction |
|---|---|
| A heating unit | A unit that provides heat |
| A fan | one or more fans |
| A cooling manifold surrounding said opening and facing said upper surface outside of said cooking enclosure | A flange and air outlets extending from the lower portion of the power head, and surrounding said opening and facing said upper surface outside of said cooking enclosure |
| To direct the cooling air flow from the fan chamber toward the upper surface of the cooking enclosure to cool the upper surface | to guide the cooling air flow from the fan chamber in the direction of the upper surface of the cooking enclosure to cool the upper surface |

### B.  Morningware's Oven – The Accused Infringing Product

Morningware markets, advertises, and sells counter-top electronic ovens in the United States, primarily via the internet, through its website, and through retail.  *See Morningware*, 2012 WL 3721350, at *3.  One of those ovens is the HO-1200 Oven ("Morningware's Oven"), which is at issue in this case.

### C.  The Air Outlets and Air Flow in Morningware's Oven

At issue in Morningware's motion for summary judgment is whether Morningware's Oven infringes claim 3 of the '217 Patent.  The parties dispute whether Morningware's Oven discloses (1) a flange and air outlets extending from the lower portion of the power head, and surrounding said opening and facing said upper surface outside of said cooking enclosure; and

---

[2]  The Court previously construed the disputed claim terms.  *See Morningware, Inc. v. Hearthware Home Prods., Inc.*, No. 09 C 4348, 2011 WL 722520 (N.D. Ill. Feb. 23, 2011) and 2011 WL 1376920 (N.D. Ill. Apr. 12, 2011).

(2) a plurality of air outlets arranged to guide the cooling air flow from the fan chamber in the direction of the upper surface of the cooking enclosure to cool the upper surface. In particular, the parties disagree on whether Morningware's Oven has air outlets that face the upper surface of the cooking enclosure, and whether the air outlets in Morningware's oven are "arranged to guide the cooling air flow" in "the direction of the upper surface of the cooking enclosure to cool the upper surface" of the cooking enclosure. The parties' experts address these issues.

### 1. The Experts

Morningware's expert, Mr. Aaron J. Jones, P.E., is a professional engineer, and is Vice President of Transportation and Materials Engineering at ITC Experts in Sugar Grove, Illinois. (R. 299-1, Jones Resume.) Mr. Jones earned a bachelor of science degree in metallurgical engineering from the Illinois Institute of Technology ("IIT") in 1995, and he earned his master's degree in metallurgical and materials engineering from IIT in 1998. (*Id.*) He is currently a Ph.D. candidate in materials engineering at IIT. (*Id.*) Mr. Jones worked as Senior Director of Materials and Transportation Engineering at Packer Engineering, Inc. for approximately 14 years before joining ITC Experts in 2011. (*Id.*) At Packer Engineering, Inc., Mr. Jones provided engineering consulting services related to materials and mechanical issues in products and personal injury cases. (*Id.*) At ITC Experts, Mr. Jones specializes in analyzing mechanical and material causes of failures in engineered systems, with a focus in vehicle transportation equipment, piping systems, pressure vessels, consumer products, process equipment, and joined components. (*Id.*)

Morningware's other expert, Mr. Chad Erickson, was a co-founder and co-owner of American Harvest, a housewares manufacturing company that developed and patented the Jet

Stream Oven, which is discussed in more detail below. (R. 299-4, Erickson Report at 1.) Mr.

Erickson was the primary inventor on most of the 20+ patents issued to American Harvest. (*Id*.)

He has a bachelor's degree in psychology. (*Id*.)

Hearthware's expert, Mr. Randy Clarksean, P.E., Ph.D., is a professional engineer.

(R. 299-5, Clarksean Report at 20.) He earned his bachelor of science degree in mechanical

engineering, with highest honors, from the South Dakota School of Mines and Technology. (*Id*.)

He also obtained his doctorate of philosophy in mechanical engineering from the University of

Utah. (*Id*.) Mr. Clarksean is President of Kevin Kennedy Associates Inc., a position he has held

since 2008. Prior to that, he was Vice President of Engineering and Lead Consultant for Kevin

Kennedy Associates Inc. and an Adjunct Professor at the University of Nevada–Las Vegas,

where he performed engineering research and conducted seminars on heat transfer, fluid

mechanics, thermal systems, and thermodynamics. (*Id*.) He has experience in the areas of heat

transfer, fluid flow, mass transfer, and basic structural analysis. (*Id*.)

### 2.    Relevant Opinions

Morningware's Oven contains air outlets that surround the exterior rim of the power

head. (R. 300, Morningware's Noninfringement SOF ¶ 1.) Mr. Jones performed a study of the

air flow of Morningware's Oven. (Hearthware's Noninfringement Add'l SOF ¶ 21.) Because

molecules of air are invisible, he conducted the test using "water-based theatrical fog" so that he

could observe the air flow. (*Id*.; R. 299-1, Jones Report at 2.) Based on his study, Mr. Jones

opines that the air exiting from Morningware's Oven flowed "radially outward" from the exhaust

vents, and "tended to expand vertically as it flowed radially away from the exhaust vents."

(Morningware's Noninfringement SOF ¶ 5.) He further explains that during his testing of

9

Morningware's Oven, he did not observe any evidence "that the airflow was being directed downward towards the cooking chamber." (*Id.*) Instead, the air "dispersed" outward from the air outlets. (Hearthware's Noninfringement Add'l SOF ¶ 23.) In addition, Morningware's other expert, Mr. Erickson, opines that

> Unlike the axial type fan used in the Moon 217 PATENT, the Morningware oven uses a metal paddle wheel blower to draw cooling air down into inlet vents, and then expel the used cooling air directly out of the motor chamber in a 360 degree horizontal fashion. The blower is positioned below the motor and in line with the exhaust vents surrounding said blower. There are no scrolls, shrouds or vanes to redirect the air flow, or cause the exiting air to change direction from the horizontal path initiated by this horizontally mounted blower. The design of this air flow 'system' does not indicate any intent on the part of the designers to direct this air flow in a downward fashion, or to provide cooling to the top surface of the cooking enclosure.

(Morningware's Noninfringement SOF ¶ 7.) According to him, the "air flow exiting the Morningware oven vents is not directed in a downward fashion, 'to direct the cooling air flow from the fan chamber toward the upper surface of the cooking enclosure to cool the upper surface' as claimed in the . . . '217 Patent." (*Id.*)

> Hearthware's expert, Dr. Clarksean, opines that the air outlets in Morningware's Oven
>
> act as a jet when the air flow leaves the power head air outlets. Each of the jet interacts [sic] with the adjacent jet (adjacent openings) . . . . Because the flow acts like a jet[,] [t]he flow will spread out as the center velocity of the jet decreases while the jet becomes wider; [and] [f]low recirculation exists because as the flow comes out the bottom of the holes, it shears against the fluid below it causing the fluid below to start to move. As that fluid starts to move, it will rotate around as shown by the blue circular arrow shown in Figure 3 [of Dr. Clarksean's Report].

(*Id.* ¶ 9; Hearthware's Noninfringement Add'l SOF ¶¶ 24, 33.) He further opines that from his review of photographs of the air flow from Morningware's Oven, the air (represented by smoke in the photographs) "slowly comes out of the opening, spreads wider, and is even shown going

10

down past the upper surface of the cooking enclosure." (Morningware's Noninfringement SOF ¶ 5.) According to Dr. Clarksean,

> [i]n order for the smoke to move lower than the outer edge of the cooking enclosure, it must be moving outward and downward. By moving in an outward and downward direction . . . the flow from the Morningware oven meets the requirement that '. . . a plurality of air outlets arranged to guide the cooling air flow from the fan chamber in the direction of the upper surface of the cooking enclosure . . .'

(*Id.* ¶ 10.) Dr. Clarksean further opines that "[t]he flow does move in the direction of the upper surface of the cooking enclosure." (*Id.*) He did not perform any independent testing regarding the direction of air flow in Morningware's Oven.[3] (*Id.* ¶ 8.)

Dr. Clarksean, however, designed an experiment to compare the temperature of the upper surface of Morningware Oven's cooking enclosure when the air is flowing from the outlets and the temperature when the air is not flowing. (Hearthware's Noninfringement Add'l SOF ¶ 35.) Based on his experiment, Dr. Clarksean concluded that the "temperature of the air leaving the air outlets is less than the temperature of the [upper surface of the cooking enclosure] after the initial heat-up" and that "[c]ooler air flowing over a hot surface will result in heat transfer from that surface." (*Id.* ¶ 36.) Accordingly, he opines that "the air flow from the outlets [in Morningware's Oven] cools the [upper surface of the cooking enclosure]." (*Id.*)

In response to Dr. Clarksean, Mr. Jones opines that "the fact that the airflow spreads out or disperses in all directions as it decelerates after exiting the air outlets is not a result of it being

---

[3] Hearthware contends that Dr. Clarksean's "temperature experiment involved determining whether air flow from the Morningware's [sic] oven's air outlets cools the upper surface of its cooking enclosure." *See* R. 343, Hearthware's Resp. to Morningware's Local Rule 56.1 SOF ¶ 8. Hearthware, however, does not assert that Dr. Clarksean performed testing regarding the direction of the air flow in Morningware's Oven.

directed or guided. Rather, it is the physical result of the airflow decelerating due to the

molecules in the air colliding with the air molecules outside the power head as it moves away

from the exhaust outlet." (Morningware's Noninfringement SOF ¶ 11.) He further states that

the "flow recirculation" that Dr. Clarksean describes is "the normal result of fluid flow in a

medium as molecules collide and is not related to the airflow being mechanically directed

towards the cooking enclosure." (*Id.*) Additionally, he opines that

> airflow does not need to be directed at a surface in order to change the
> temperature of the surface . . . . Airflow exits the power head air outlet and
> disperses, shears, and mixes with the warmer air molecules above the top surface
> of the cooking enclosure, absorbing heat energy as it moves away from the power
> head. This mechanism may result in a change in the surface temperature of the
> upper surface of the cooking enclosure, but it is not reflective of airflow being
> directed toward it.

(*Id.* ¶ 16.)

### III.    Facts Relevant to Morningware's Invalidity and Unenforceability Motions for Summary Judgment

At issue in Morningware's motions for summary judgment regarding invalidity and

unenforceability of the '217 Patent is 1) whether prior art invalidates claim 3 of the '217 Patent,

and 2) whether Mr. Moon committed inequitable conduct by failing to disclose prior art to the

PTO.

#### A.    Alleged Prior Art to the '217 Patent

##### 1.    The Erickson Patents and the Jet Stream Oven

The Jet Stream Oven is a commercial embodiment of United States Patent No. 4,817,509

(the "'509 Patent" or the "Erickson '509 Patent"). (R. 292, Morningware's Invalidity SOF ¶ 20.)

The Jet Stream Oven was introduced into the U.S. market in 1989. (*Id.* ¶ 18.) Mr. Moon and the

other inventors of the '217 Patent knew of the Jet Stream Oven before developing Hearthware's

oven, and they compared the Hearthware oven to the Jet Stream Oven to come up with Hearthware's design.[4] (R. 288, Morningware's Inequitable Conduct SOF ¶¶ 6-7.) Mr. Moon and his counsel also were aware of the '509 Patent and United States Patent No. 5,165,328 (the "'328 Patent," and together with the '509 Patent, the "Erickson Patents") and 4,350,874 (the "Nishikawa Patent") before they filed the application for the '217 Patent. (*Id.* ¶¶ 8, 10-11.)

### 2. The Nishikawa Patent

The Nishikawa Patent discloses the following:

> the Silocco fan 21 is rotated to forcibly exhaust hot air in the radiating chamber 17, which results from the radiation of heat produced from the sheath heater 23, through an exhaust hole 26 to the outside of the outer case 9, thus preventing excessive temperature rise of the ceiling of the outer case.

(*Id.* ¶ 19.) The same firm that prosecuted the '217 Patent application on Mr. Moon's behalf also represented the Nishikawa Patent owner in connection with two reexaminations of the Nishikawa Patent. (*Id.* ¶ 12.) The last of the two reexaminations concluded almost two years before the '217 Patent application was filed. (*Id.*) During the first reexamination of the Nishikawa Patent, Hearthware's patent firm added claim 9, specifically claiming "said case member having an upper wall/ceiling with an upwardly facing surface that is exposed at the top of the case, said cooling fan being directly exposed to the upper wall/ceiling." (*Id.* ¶ 29.) Additionally, claim 23 recites that the cooling fan "is immediately adjacent to the upper wall/ceiling." (*Id.* ¶ 30.)

---

[4] Although neither party expressly includes it in their respective Rule 56.1 statements of fact, it is apparent from the context of this case that Hearthware's oven – the "NuWave" Oven – is a commercial embodiment of the '217 Patent.

13

### 3.     The IMEX ZO-90 Oven

Mr. Eugene Song, through his company, IMEX Corporation, sold the IMEX ZO-90 Oven (the "IMEX Oven"). (Morningware's Invalidity SOF ¶ 1.) Jenny Ahn, one of Hearthware's Rule 30(b)(6) witnesses, testified that Mr. Song brought the IMEX Oven to Mr. Moon in Korea in 1996 or 1997, and that the IMEX Oven provided the conceptual starting point for developing Hearthware's oven. (*Id.* ¶ 2.) Ms. Ahn also testified that Mr. Moon and Mr. Alan Kelley, another inventor of the '217 Patent, knew of the IMEX Oven before April 12, 1998, which is more than one year before they filed the application for the '217 Patent. (*Id.* ¶ 3.) Mr. Moon tried to sell the IMEX Oven at trade shows in the United States at least one year, and possibly as many as three years, before he began developing Hearthware's oven. (*Id.* ¶ 4.) Hearthware, including the co-inventors of the '217 Patent, looked at the IMEX Oven as part of the development process for Hearthware's oven. (*Id.* ¶¶ 5, 31.) Mr. Moon testified during his deposition that the IMEX Oven was not commercially viable and that he had to develop his own oven. (Hearthware's Invalidity Add'l SOF ¶ 38.)

By September 1998, seven months before Mr. Moon and his co-inventors filed the application for the '217 Patent, Mr. Moon was aware of the airflow for the IMEX Oven. (Morningware's Inequitable Conduct SOF ¶ 22.) Specifically, Mr. Moon compared, in writing, an oven design that Hearthware's supplier, Sung Kwang Electronics ("Sung Kwang" or "SKE"), had proposed (the "SKE Oven"), with the IMEX Oven. (*Id.*) He noted that with the IMEX Oven, "cool air cools the timer, the motor, etc," and with the SKE Oven, "the air that has become hot is sucked in and makes the PCB, LCD, and motor unnecessarily hot." (*Id.*) He also wrote

"[n]eedless to say, [the IMEX Oven] is the correct design to go for. However, 1/3 of the engineers are not yet aware of this, which is difficult for me to understand." (*Id*.) Mr. Moon's drawing describes the IMEX Oven's airflow–specifically, that the air comes in from the top of the unit and flows down over the cooking enclosure. (*Id*. ¶ 23.)

On March 9, 1999, Mr. Moon wrote a letter to Mr. Yeon J. Kim and others from SKE. (*Id*. ¶ 9.) In that letter, Mr. Moon stated that

> 4.  IMEX's PATENTs had been SUEed and defeated in litigation in the United States for infringing the enclosed PATENTs [listing the Erickson Patents], and moreover, the technology which was already disclosed in [the Nishikawa Patent] was used by MOTOR to apply for a patent which is limited to a structure which is completely wrapped with an insulation material for production without using water (it infringes the '874 patent[]). The determination that our company's IRC clearly does not infringe not only IMEX's patents, but also 4,817,509, 5,165,328 and 4,350,874, has been officially confirmed by legal analysis which has been completed.
>
> 5.  IMEX patent contents could be easily invalidated with NISHIKAWA and ERICKSON PATENTS even in Korea, and
>
> 6.  at IBC, legal consultation and analysis have been completed with respect to the current SK IRC's new patent application. This patent does not conflict with the aforementioned four existing patents. When a patent is ISSUEd at a later date, we plan on providing your company with a COPY. Due to the fact that your company delayed providing an ASSIGNMENT LETTER for more than one month without any particular reason, the present progress has been slowed down.

(*Id*. (emphasis in original).) Mr. Moon's letter attached the first pages of the Erickson Patents and the Nishikawa Patent. (*Id*.)

15

The IMEX Oven has four air outlets.[5]  (Hearthware's Invalidity Add'l SOF ¶ 10.)
Hearthware's expert, Dr. Clarksean, opines that the air flow from the air outlets does not "cool
the upper surface" because the IMEX Oven has only four air outlets, and air emanating from
those openings does not cover the complete upper surface of the IMEX Oven cooking enclosure.
(*Id*. ¶ 10.)  Dr. Clarksean testified during his deposition that the air flow from the IMEX Oven
air outlets causes localized cooling of the upper surface, and he has opined that the four air
outlets in the IMEX Oven cool approximately two-thirds of the upper surface of the cooking
enclosure.  (*Id*. ¶¶ 11, 15.)  He further opines that the "non-uniform nature of the air flow would
also result in temperature gradients around the upper surface of the cooking enclosure, inducing
thermal stresses in those regions."  (*Id.* ¶ 17.)  In addition, Dr. Clarksean concluded that
"[s]omeone familiar with the art of heat transfer and fluid flow would not have designed a
system in such a manner if the purpose was to cool the upper surface."  (*Id.* ¶ 18.)  Dr. Clarksean
did not evaluate whether the IMEX Oven includes the limitation of claim 3 that requires a gap
between the power head and the cooking enclosure to vent air.  (Morningware's Invalidity SOF
¶¶ 14-15.)

Mr. Jones, Morningware's expert, conducted tests of the IMEX Oven.  (*Id*. ¶ 8.)  Mr.
Jones' tests also show that heated air from the cooking enclosure of the IMEX Oven exits
through a vent created by a gap between the cooking enclosure and the power head.  (*Id*. ¶ 12.)

---

[5]  Hearthware's argument that a genuine dispute of material fact exists as to whether the
air openings in the IMEX Oven are "air outlets" is unpersuasive given its repeated admissions in
its response to Morningware's Invalidity statements of fact that the IMEX oven contains "air
outlets."  (*See* R. 338, Hearthware's Resp. to Morningware's Invalidity SOF ¶¶ 7, 9-11; *see also*
Hearthware's Invalidity Add'l SOF ¶ 10 ("The IMEX Oven has four air outlets that do not
surround the opening of its cooking enclosure.").)

Further, Mr. Jones measured the diameter of the IMEX Oven's power head as 7.853 inches and of its cooking enclosure opening as 7.991 inches. (*Id*. ¶ 13.) There is a 0.069 inch gap between the cooking enclosure opening and the power head along their circumferences. (*Id*.; *see also* ¶ 15.)

### B.      Prosecution of the '217 Patent

Hearthware did not disclose any prior art to the PTO during prosecution of the '217 Patent, nor did it file an Information Disclosure Statement ("IDS"). (R. 307, Morningware's Inequitable Conduct SOF ¶ 32.) Ms. Ahn, Hearthware's 30(b)(6) witness, testified that Hearthware made the decision not to disclose the IMEX Oven to the PTO after discussions with its attorneys. (*Id*. ¶ 33.) When asked why Hearthware decided not to disclose the IMEX Oven to the PTO, Ms. Ahn testified that "[w]hen [Hearthware] developed [its] product and [its] patent, it was different with [sic] IMEX one, and our company advised our lawyer of this at the time." (Hearthware's Inequitable Conduct Add'l SOF ¶ 27.)

Mr. Moon's counsel testified that it was their usual practice not to submit prior art to the PTO until the examiner had performed his search and provided the results. (Morningware's Inequitable Conduct SOF ¶ 35.) Then, counsel would determine whether they should cite the prior art they had that the examiner did not cite. (*Id*.) Counsel testified that such was likely their practice in connection with the '217 Patent. (*Id*.) Hearthware's counsel made a deliberate decision not to disclose the IMEX Oven or any prior art to the PTO. (*Id*.)

During prosecution of the '217 Patent, the examiner considered U.S. Patent No. 5,465,651 (the "'651 Patent"). (Hearthware's Inequitable Conduct Add'l SOF ¶ 13.) The '651 Patent is related to the Erickson Patents (the '509 and '328 Patents), and includes similar

disclosures.[6]  (*Id.*)  In response to an Office Action in which the examiner rejected the original claim 1 under § 102 in view of the '651 Patent, Hearthware and its attorneys argued that

> Erickson et al. does not disclose or suggest a cooling manifold including a lower surface facing an upper surface outside of a cooking enclosure, let alone a plurality of air outlets arranged in such a lower surface to direct a cooling air flow from a fan chamber towards the upper surface of the cooking enclosure, as recited in amended claim 1.  Accordingly, the rejection of claim 1 should be withdrawn and the claim allowed.

(Morningware's Inequitable Conduct SOF ¶ 18; Hearthware's Inequitable Conduct Add'l SOF ¶ 20.)

## C.    Reexamination of the '217 Patent

On reexamination of the '217 Patent, the examiner found that the Erickson '509 Patent anticipated original claim 1.  (Morningware's Inequitable Conduct SOF ¶ 16.)  The related Erickson '328 Patent contains the same disclosure as the Erickson '509 Patent.  (*Id.*)  Hearthware thereafter amended rejected claim 1 of the '217 Patent during reexamination by adding the following language to the end of the claim:

> wherein said heating unit is spaced from said opening to define a hot gas vent surrounding said heating unit and located between said heating unit and said air outlets to vent hot gas from the inside of the oven housing for mixture with said cooling air flow from said air outlets.

(Hearthware's Inequitable Conduct Add'l SOF ¶ 14.)  This language is identical to the last limitation in claim 3, except that "oven housing" in amended claim 1 is replaced with "cooking enclosure" in claim 3. (Morningware's Invalidity SOF ¶ 26.)

---

[6]  Although neither party mentions it, the '217 Patent indicates that the examiner cited the '509 Patent as a reference.  (*See* R. 306-2, '217 Patent at 1.)

## SUMMARY JUDGMENT STANDARD

Although this is a patent case that is appealable to the Federal Circuit, Seventh Circuit law applies to procedural summary judgment issues. *See, e.g., Shum v. Intel Corp*., 633 F.3d 1067, 1076 (Fed. Cir. 2010) ("We review grants of summary judgment . . . under the law of the regional circuit, since they present procedural issues not unique to patent law.") (citing *Koninklijke Philips Elects. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1332 (Fed. Cir. 2010)). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In deciding summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the initial burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (citation omitted). "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." *Omnicare, Inc. v. UnitedHealth Grp., Inc*., 629 F.3d 697, 704-05 (7th Cir. 2011) (internal citations omitted).

19

## ANALYSIS

**I.**   **The Court Denies Morningware's Motion for Summary Judgment On Its Claim for Noninfringement of Claim 3 of the '217 Patent**

"Determining literal infringement is a two step process: the 'proper construction of the asserted claim and a determination whether the claim as properly construed reads on the accused product or method.'"  *ActiveVideo Networks, Inc. v. Verizon Comm'cns*, --- F.3d ----, 2012 WL 3636908, *2 (Fed. Cir. Aug. 24, 2012) (quoting *Georgia–Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1330 (Fed. Cir. 1999)).  While the first step is a question of law for the Court, the second step is a question of fact.  *Id.*  "'To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims.'"  *Alcohol Monitoring Sys., Inc. v. Actsoft, Inc*., 414 Fed. App'x 294, 300 (Fed. Cir. 2011) (quoting *Mas–Hamilton Grp. v. LaGard, Inc*., 156 F.3d 1206, 1211 (Fed. Cir. 1998)).[7]  "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law."  *Bayer AG v. Elan Pharm. Research Corp*., 212 F.3d 1241, 1247 (Fed. Cir. 2000) (citation omitted).

**A.**   **A Dispute of Material Fact Exists as to Whether the Air Outlets In Morningware's Oven Face the Upper Surface of the Cooking Enclosure**

Pursuant to the Court's construction of the disputed terms in claim 3, that claim teaches, among other things, "a flange and air outlets extending from the lower portion of the power head, and surrounding said opening and *facing said upper surface outside of said cooking enclosure*."  *See Morningware,* 2011 WL 722520, at *1 (emphasis added).  As is apparent from viewing the photographs of Morningware's Oven in both Morningware's and Hearthware's

---

[7]  Because the Court previously struck Hearthware's contentions as they relate to the doctrine of equivalents, Hearthware cannot assert that Morningware's Oven infringes claim 3 of the '217 Patent under the doctrine of equivalents.  (R. 139.)

expert reports, the upper surface of the cooking enclosure is a slightly slanted horizontal surface that slopes downward and away from the opening of the cooking enclosure. Morningware argues that because the air outlets are on a "vertical plane" surrounding the exterior rim of the power head, they do not "face" the upper surface of the cooking enclosure and thus do not meet all of the limitations in claim 3. (R. 299, Morningware's Noninfringement Mot. at 4-5.)

Hearthware, on the other hand, argues that Morningware is not entitled to summary judgment because "the lower lips of the air outlets on the flange of Morningware's oven face the top of the cooking enclosure," and thus the air outlets face the upper surface of the cooking enclosure.[8] (Hearthware's Noninfringement Opp. at 8.) Hearthware's expert, Dr. Clarksean, opines that the air outlets in Morningware's Oven "face the upper surface of the cooking enclosure." (R. 342-4, Clarksean Report at 5.) Morningware concedes that "a portion of some air outlets of Morningware's Oven extend inward from the outer perimeter of the surface containing the outlets." (R. 361, Morningware's Noninfringement Reply at 3.)

Hearthware has established that a genuine dispute of material fact exists as to the factual determination of whether the air outlets on Morningware's Oven face the upper surface of the cooking enclosure. Although it appears from an initial view of a photograph of the air outlets on Morningware's Oven that the majority of the air outlet does not face the upper surface of the cooking enclosure, the Court cannot determine that no reasonable jury could find that

---

[8] Hearthware's suggestion that the term "facing" applies to the "flange" or the "flange having air outlets" and not the air outlets individually, (*see* R. 351, Hearthware's Noninfringement Opp. at 7-8), fails. There is no support in the Court's construction or the text of claim 3 for applying "facing" to only the flange and not the air outlets. *See Morningware*, 2011 WL 722520, at *1 (a flange *and* air outlets extending from the lower portion of the power head, and surrounding said opening and *facing said upper surface outside of said cooking enclosure*") (emphasis added).

21

Morningware's Oven meets the limitation.[9]  *See Anderson*, 477 U.S. at 248 (a genuine dispute of material fact exists when the "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  Morningware's statement that at least a portion of some air outlets in its oven "extend inward from the outer perimeter of the surface containing the outlets" confirms that a genuine issue of material fact exists.

> **B.**     **A Genuine Dispute of Material Fact Exists as to Whether the Air Outlets In Morningware's Oven Are Arranged to "Guide the Cooling Air Flow From the Fan Chamber in the Direction of the Upper Surface of the Cooking Enclosure to Cool the Upper Surface"**

The parties vigorously dispute whether the air outlets in Morningware's Oven "guide the cooling air flow from the fan chamber in the direction of the upper surface of the cooking enclosure to cool the upper surface."  Both parties rely on their respective expert's testimony in support of their arguments.  Morningware's experts, Messrs. Jones and Erickson, opine that the air outlets do not direct the air flow in the direction of the upper surface of the cooking enclosure.  In particular, Mr. Jones opines that the air flows "radially outward" from the vents and "tend[s] to expand vertically as it flow[s] radially away from the exhaust vents." (Morningware's Noninfringement SOF ¶¶ 5, 23; *see also* Hearthware's Noninfringement Add'l SOF ¶ 23.)  Mr. Erickson explains that the "air flow exiting the Morningware oven vents is not directed in a downward fashion, 'to direct the cooling air flow from the fan chamber toward the upper surface of the cooking enclosure to cool the upper surface.'"[10]  (Morningware's

_____

[9]  The parties provided the Court with only a small, dark photograph of Morningware's Oven, in which the air outlets are difficult to see.  (*See* Morningware's Noninfringement Mot. at 5.)

[10]  Hearthware urges the Court to place less weight on Mr. Erickson's testimony because he did not consider the Court's claim construction ruling in his expert analysis.  (Hearthware's

Noninfringement SOF ¶ 7.)  Morningware also submits a video showing the air flow in

Morningware's Oven, which it asserts demonstrates that the air outlets do not direct the air flow

toward the upper surface of the cooking enclosure.  (*Id.* ¶ 4; *see also* R. 299-3.)  Hearthware

disputes Morningware's characterization of the air flow based on that video.  (Hearthware's

Resp. to Morningware's Noninfringement SOF ¶ 4.)

Hearthware's expert, Dr. Clarksean, opines that the air flow from the outlets "flows in the

direction of the upper surface of the cooking enclosure."  (Morningware's Noninfringement SOF

¶ 10.)  Dr. Clarksean opines that the air outlets in Morningware's Oven

> act as a jet when the air flow leaves the power head air outlets.  Each of the jet
> interacts [sic] with the adjacent jet (adjacent openings). . . .  Because the flow acts
> like a jet[,] [t]he flow will spread out as the center velocity of the jet decreases
> while the jet becomes wider; [and] [f]low recirculation exists because as the flow
> comes out the bottom of the holes, it shears against the fluid below it causing the
> fluid below to start to move.  As that fluid starts to move, it will rotate around as
> shown by the blue circular arrow shown in Figure 3 [of Mr. Clarksean's Report].

(*Id.* ¶ 9; Hearthware's Noninfringement Add'l SOF ¶¶ 24, 33.)  He further opines that from his

review of the photographs of the air flow from Morningware's Oven reproduced in his report,

the air (represented by smoke in the photographs) "slowly comes out of the opening, spreads

wider, and is even shown going down past the upper surface of the cooking enclosure."

(Morningware's Noninfringement SOF ¶ 10.)  According to Dr. Clarksean,

> [i]n order for the smoke to move lower than the outer edge of the cooking
> enclosure, it must be moving outward and downward.  By moving in an outward
> and downward direction . . . the flow from the Morningware oven meets the

---

Invalidity Opp. at 6.)  It is well-settled, however, that the Court cannot weigh expert testimony
or make credibility determinations on summary judgment.  *See Omnicare*, 629 F.3d at 704-05
("[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting
evidence or make credibility determinations, both of which are the province of the jury.")
(internal citations omitted).

requirement that '. . . a plurality of air outlets arranged to guide the cooling air flow from the fan chamber in the direction of the upper surface of the cooking enclosure . . .'

(*Id.*)  In addition, Dr. Clarksean opines that "[t]he flow does move in the direction of the upper surface of the cooking enclosure."  (*Id.*)

Patent infringement is a question of fact.  *Mirror Worlds, LLC v. Apple, Inc.*, — F.3d —, 2012 WL 3800812, *4 (Fed. Cir. Sept. 4, 2012) ("The jury's determination of infringement is a question of fact . . . .").  The parties' reliance on differing characterizations of air flow from the same testing, combined with the competing expert testimony in this case, underscores that the issue of whether the air outlets in Morningware's Oven are arranged to "guide the cooling air flow from the fan chamber in the direction of the upper surface of the cooking enclosure to cool the upper surface" is an issue of fact for the jury.  *See Omnicare*, 629 F.3d at 704-05 ("[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury."); *see also Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011) ("Where there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate.") (citation omitted).  In addition, the Court has viewed the video of the air flow in Morningware's oven, which confirms that the issue Morningware asks the Court to decide is an issue of fact for the jury.  Accordingly, the Court denies Morningware's motion for summary judgment of noninfringement of claim 3 of the '217 Patent.

## II.    The Court Denies Morningware's Motion for Summary Judgment That Claim 3 of the '217 Patent Is Invalid

Morningware moves for summary judgment on its counterclaim for a declaratory judgment that claim 3 of the '217 Patent is invalid as anticipated under 35 U.S.C. § 102 and/or as obvious under 35 U.S.C. § 103. (R. 291, Morningware's Invalidity Mot. at 1.) Specifically, Morningware asserts that the prior art IMEX Oven anticipates claim 3, and that the IMEX Oven and the Jet Stream Oven, combined with the '509 Patent, render claim 3 obvious as a matter of law. (*Id.*) Because patents are presumed valid, *see* 35 U.S.C. § 282, the challenging party must prove invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, — U.S. —, 131 S. Ct. 2238, 2242, 180 L. Ed. 2d 131 (2011); *Santarus, Inc. v. Par Pharm., Inc.*, — F.3d —, 2012 WL 3797966, *6 (Fed. Cir. Sept. 4, 2012) (citing *Microsoft*, 131 S. Ct. at 2242).

### A.    Anticipation

"If the claimed invention was 'described in a printed publication' either before the date of invention, 35 U.S.C. § 102(a), or more than one year before the U.S. patent application was filed, 35 U.S.C. § 102(b), then that prior art anticipates the patent." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008). "[I]nvalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advance Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000); *see also Old Reliable Wholesale, Inc. v. Cornell Corp.*, 635 F.3d 539, 544 (Fed. Cir. 2011) ("'Anticipation requires that all of the claim elements and their limitations are shown in a single prior art reference.'") (quoting *In re Skvorecz*, 580 F.3d 1262, 1266 (Fed. Cir. 2009)). Even though § 102 "refers to 'the invention' generally, the anticipation inquiry proceeds

25

on a claim-by-claim basis." *Finisar Corp.*, 523 F.3d at 1334 (citing *Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1319 (Fed. Cir. 2007)). Anticipation is a question of fact. *Id.*

Morningware argues that all of the elements of claim 3 of the '217 Patent are contained in the IMEX Oven, generally citing Mr. Erickson's expert report. (Morningware's Invalidity Mot. at 5.) In its briefing, however, Morningware specifically concentrates on only two of these elements, namely the cooling manifold element (the "Cooling Manifold Element") and the element related to the spacing of the heating unit (the "Gap Element"). (*Id.*) The Court addresses each of these elements below.

### 1. The Cooling Manifold Element

The Cooling Manifold Element recites:

> a cooling manifold surrounding said opening and facing said upper surface outside of said cooking enclosure, the cooling manifold in fluid communication with the fan chamber and including a plurality of air outlets arranged to direct the cooling air flow from the fan chamber toward the upper surface of the cooking enclosure to cool the upper surface.

(R. 337-2, '217 Patent, col. 8, l. 65 through col. 9, l. 4.) As explained more fully below, genuine disputes of material fact exist as to (i) whether the IMEX Oven has air outlets surrounding the opening of its cooking enclosure, (ii) whether the IMEX Oven cools the upper surface of its cooking enclosure, and (iii) whether the IMEX Oven guides cooling air flow in the direction of the upper surface of its cooking enclosure. (*See* Hearthware's Invalidity Opp. at 4.)

26

The parties dispute whether the IMEX Oven, which is prior art under 35 U.S.C. § 102(a),[11] contains the portion of the Cooling Manifold Element which states: "a cooling manifold surrounding said opening." (*See* Morningware's Invalidity Mot. at 5-7; Hearthware's Invalidity Opp. at 4-6.) The Court has construed "a cooling manifold surrounding said opening and facing said upper surface outside of said cooking enclosure" as meaning "a flange and air outlets extending from the lower portion of the power head, and surrounding said opening and facing said upper surface outside of said cooking enclosure." *See Morningware*, 2011 WL 722520, at *1.

The IMEX Oven contains four air outlets. (Hearthware's Invalidity Add'l SOF ¶ 10.) Although the parties agree that the word "surrounding" means "to enclose on all sides" or to "encircle" (*id.* ¶ 11), they disagree as to whether the IMEX Oven's air outlets in fact "surround" the opening of the cooking enclosure. Hearthware argues that the IMEX Oven has one air outlet on each of the four corners of the cooking enclosure that does not "surround" the opening of the cooking enclosure. (Hearthware's Invalidity Opp. at 6.) Morningware, on the other hand, argues that the IMEX Oven's four air outlets indeed surround the cooking enclosure. Whether the four air outlets surround the opening of the cooking enclosure is a question of fact. Because a reasonable jury could find in favor of either party on this factual determination, the Court cannot grant summary judgment in Morningware's favor. *See ActiveVideo Networks*,

---

[11] Morningware asserts that the IMEX Oven is prior art under § 102(a) based on, among other things, the inventor Mr. Moon's display and offer for sale of the IMEX Oven "at trade shows in the United States one or two or three years before he began to develop his oven." (Morningware's Invalidity Mot. at 4.) Hearthware does not dispute that the IMEX Oven is prior art and explicitly refers to it as such. (Hearthware's Invalidity Opp. at 11.)

2012 WL 3636908, at *11 ("Anticipation under 35 U.S.C. § 102 is a question of fact.") (citation omitted).

In addition, the parties dispute whether the IMEX Oven contains "a plurality of air outlets arranged to direct the cooling air flow from the fan chamber toward the upper surface of the cooking enclosure to cool the upper surface." (*See* Morningware's Invalidity Mot. at 5; Hearthware's Invalidity Opp. at 7.) The Court has construed the term "to direct the cooling air flow from the fan chamber toward the upper surface of the cooking enclosure to cool the upper surface" as meaning "to guide the cooling air flow from the fan chamber in the direction of the upper surface of the cooking enclosure to cool the upper surface." *Morningware*, 2011 WL 722520, at *1. The parties' dispute has two components: (1) whether the IMEX Oven contains air outlets that are "arranged to direct the cooling air flow from the fan chamber toward the upper surface of the cooking enclosure"; and (2) whether the air flow is directed or guided "to cool the upper surface."

As to the first component, Morningware argues that Mr. Jones's expert report and a video of his test of the IMEX Oven conclusively show that the air flow from the IMEX Oven's "fan chamber and cooling manifold [is] guided downward toward the upper surface of the cooking enclosure." (Morningware's Invalidity Mot. at 6.) Mr. Jones opines as follows:

**3.2 Imex Oven Power Head Exhaust Airflow**
The air exiting from the exhaust vents on the lower surface of the power head of the Imex oven was observed flowing downwards towards the cooking chamber. A still capture of the airflow exiting the exhaust vents is shown in Figure 5. The airflow tended to contact the cooking chamber and then flow off the cooking chamber and away from the oven. The power head exhaust flow on this unit was distinctly different than that observed on the Morningware oven.

(R. 299-1, Jones Report at 4.)

28

Hearthware responds that the four outlets located in the corners of the IMEX Oven are not arranged to guide or direct the cooling air flow from the fan chamber in the direction of the upper surface of the cooking enclosure "because they are large release regions and do not direct air flow." (Hearthware's Invalidity Opp. at 10.) In support, Hearthware cites Dr. Clarksean's report, where he opines that

> the air outlets are effectively open space and were not designed to 'guide the cooling air flow from the fan chamber in the direction of the upper surface of the cooking enclosure to cool the upper surface.' The air that is the result of the cooling fan is cooling chamber is dumped out to the surrounding area.

(*Id.* (citing R. 337-3, Clarksean Report at 7).)

Morningware has failed to show that, based on the undisputed facts in the record, no reasonable jury could find that the IMEX Oven's air outlets are not arranged to guide air flow toward the upper surface of the cooking enclosure. The video evidence on which Morningware relies is less than conclusive, as is the parties' respective expert testimony. Notably, Morningware's reliance on largely conclusory expert testimony is insufficient to meet its burden on summary judgment of demonstrating that no genuine dispute of material fact exists. *See, e.g., Chamberlain Grp., Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 951 (explaining that, on summary judgment, "[g]ratuitous assertions . . . , which are devoid of substantive explanation and analysis, need not be credited.") (citations omitted).

As to the second component, Morningware argues that the air flow in the IMEX Oven is guided "to cool the upper surface" in the manner of the claimed invention. In support of its argument, Morningware generally cites Mr. Jones's expert report (without providing specific page numbers) and states that he conducted tests of the IMEX Oven. Although Mr. Jones's expert report addresses the direction of air flow from the IMEX Oven and from Hearthware's

29

oven, it does not discuss whether the air flow "cools" the cooking enclosure. Indeed, the only evidence Morningware relies on to establish that the upper surface is cooled is the testimony of Hearthware's expert, Dr. Clarksean, in which he concedes that the air flow from the openings in the IMEX Oven may result in localized cooling, but not cooling of the entire surface. (Morningware's Invalidity Mot. at 6-7 (citing Clarksean 5/10/12 Dep. Tr. at 69: 10-17).) According to Morningware, because Hearthware does not dispute that the air flow from the IMEX Oven cools at least part of the cooking enclosure, the IMEX Oven discloses the Cooling Manifold Element of claim 3.

In response, Hearthware argues that Morningware improperly reads the Cooling Manifold Element as requiring that the air flow cool only a portion of the cooking enclosure, rather than its entirety. This reading, Hearthware contends, is counter to one of the stated objectives of the '217 Patent, which is "to provide a counter-top electric oven that minimizes the risk of heating housing components to a point where the components can be damaged or where a user cannot comfortably handle the housing during operation or soon after operation has been terminated." (Hearthware's Invalidity SOF ¶ 14.) Hearthware further points to Dr. Clarksean's testimony that the "non-uniform nature of the air flow [in the IMEX Oven] would also result in temperature gradients around the upper surface of the cooking enclosure, inducing thermal stresses in those regions." (Hearthware's Invalidity Add'l SOF ¶ 17.) Mr. Clarksean concludes that "[s]omeone familiar with the art of heat transfer and fluid flow would not have designed a system in such a manner if the purpose was to cool the upper surface." (*Id.* ¶ 18.) According to Hearthware, because the IMEX Oven only cools a portion of the cooking enclosure, it does not cool the cooking enclosure in the manner of the claimed invention.

The parties' dispute rests on their conflicting interpretation of what is required to meet the limitation of "to cool the upper surface" in claim 3 of the '217 Patent. Specifically, the parties dispute whether claim 3 requires the air flow to cool the entire cooking enclosure or only a portion of the cooking enclosure. The term "to cool the upper surface" is present in the actual text of claim 3, as well as in the Court's construction of claim 3. Significantly, during claim construction, both parties asserted proposed constructions that kept that portion of the claim text as it appears in the claim language. *See Morningware*, 2011 WL 722520, at *10. Indeed, Hearthware argued that "to direct the cooling air flow from the fan chamber toward the upper surface of the cooking enclosure *to cool the upper surface*," means "to guide the cooling air flow from the fan chamber in the direction of the upper surface of the cooking enclosure *to cool the upper surface*,'" while Morningware proposed "to direct the cooling air downward from the fan chamber at the upper surface of the cooking enclosure *to cool the upper surface*." *Id*. Although the parties did not identify this dispute over the meaning of "to cool the upper surface" during the claim construction process, the parties now dispute its meaning.

Because claim construction is an issue of law for the Court, *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996), based on the record and the parties' arguments, the Court cannot determine whether the IMEX Oven discloses the Cooling Manifold Element without considering the proper construction of the term "to cool the upper surface." If this case proceeds to trial, the Court will need to construe the term. *See Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308 (Fed. Cir. 2010) (holding that the district court did not err by construing a claim term during trial, where "the trial proceedings invited the jury to define [the] term on its

31

own").  Significantly, even if the Court were to construe the term "to cool the upper surface" in

the manner Morningware proposes, summary judgment as to anticipation in Morningware's

favor would nonetheless be inappropriate because, as explained below, disputed issues of fact

exist as to whether the IMEX Oven discloses the Gap Element.  Indeed, the IMEX Oven cannot

anticipate claim 3 of the '217 Patent unless it discloses each and every limitation of claim 3.  *See*

*Old Reliable Wholesale*, 635 F.3d at 544 ("'Anticipation requires that all of the claim elements

and their limitations are shown in a single prior art reference.'") (quoting *Skvorecz*, 580 F.3d at

1266).

### 2.    The Gap Element

The gap element ("Gap Element") of claim '217 recites as follows:

> wherein said heating unit is spaced from said opening to define a hot gas vent
> surrounding said heating unit and located between said heating unit and said air
> outlets to vent hot gas from the inside of the cooking enclosure for mixture with
> said cooling air flow from said air outlets.

(R. 321-2, '217 Patent, col. 9, ll. 5-10.[12])  In its response to Morningware's motion, Hearthware

focuses on the Cooling Manifold Element and does not directly address the claim language of the

Gap Element.  (Hearthware's Invalidity Opp. at 3-10.)  Moreover, Hearthware generally states

that it denies that the IMEX Oven discloses the Gap Element of the '217 Patent, but it does not

explain its argument or set forth any reasoning in support.  Even though Hearthware has failed to

respond to Morningware's argument regarding the Gap Element, the Court cannot grant

Morningware's motion for summary judgment without first determining whether Morningware

has demonstrated that the Gap Element is present in the IMEX Oven.  *See Keeton v.*

---

[12] *See* the "Relevant Facts" section of this order for a full recitation of claim 3 of the '217
Patent.

*Morningstar*, *Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) ("[A] nonmovant's failure to respond to a summary judgment motion . . . does not, of course, automatically result in judgment in favor for the movant. [The movant] must still demonstrate that it is entitled to judgment as a matter of law.") (internal citations omitted).

It is undisputed that there is a 0.069 inch gap between the IMEX Oven power head and its cooking enclosure, along the circumferences of the power head and the cooking enclosure. (Morningware's Invalidity SOF ¶ 13.) It is also undisputed that heated air from the cooking enclosure of the IMEX Oven exits through a vent created by a gap between the cooking enclosure and the power head. (*Id.* ¶ 12.) Hearthware's expert, Dr. Clarksean, did not evaluate whether the IMEX Oven includes the Gap Element in claim 3 of the '217 Patent. (*Id.* ¶ 14.) These undisputed facts, while relevant, are insufficient to conclusively establish that no reasonable jury could find that the IMEX Oven does not disclose the Gap Element. This is particularly true given that the Gap Element requires the gap to "vent hot gas from the inside of the cooking enclosure *for mixture with said cooling air flow from said air outlets*." (R. 321-2, '217 Patent, col. 9, ll. 5-10) (emphasis added). Because, as explained above, an issue of fact exists as to whether the IMEX Oven contains air outlets that produce a cooling air flow, the Court cannot determine, at the summary judgment stage, that the IMEX Oven discloses this portion of the Gap Element.

### B.     Obviousness

A patent is invalid for obviousness when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."

35 U.S.C. § 103(a). Obviousness is a question of law based on underlying questions of fact. *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1348 (Fed. Cir. 2000); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310 (Fed. Cir. 2009). The factual determinations for obviousness include: (1) the scope and content of the prior art; (2) the characteristics and understanding of an individual of ordinary skill in the relevant field of art at the time of invention; (3) the differences between the claimed invention and the prior art; and (4) the evidence of secondary factors, including commercial success, long-felt need, and the failure of others. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406-407, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966)); *see also Santarus*, 2012 WL 3797966, at *6.

Morningware's motion focuses on the scope and content of the prior art, and the differences between the claimed invention and the prior art factors. As to each, the undisputed facts in the record are insufficient to support a finding, as a matter of law, in Morningware's favor. Morningware argues that claim 3 of the '217 Patent is invalid as obvious in view of a combination of either the IMEX Oven and the Erickson '509 Patent, or the Jet Stream Oven and the Erickson '509 Patent. (Morningware's Invalidity Mot. at 12.) As discussed above, genuine issues of material fact exist as to whether the IMEX Oven discloses the Cooling Manifold Element and the Gap Element of claim 3 of the '217 Patent. Accordingly, the IMEX Oven cannot form the basis of a finding of obviousness as a matter of law on summary judgment. The Court therefore turns to the proposed combination of the Jet Stream Oven and the Erickson '509 Patent.

### 1. Jet Stream Oven

Morningware fails to establish that no genuine disputes of material fact exist as to whether the Jet Stream Oven contains the Cooling Manifold Element or the Gap Element of claim 3.[13]  Specifically, Morningware provides no evidence to support a finding that the Jet Stream Oven has "a plurality of air outlets arranged to direct the cooling air flow from the fan chamber toward the upper surface of the cooking enclosure to cool the upper surface" as in the claimed invention.  In addition, a genuine issue of material fact exists as to whether the Jet Stream Oven discloses the Gap Element of claim 3.  In support of its argument that the Jet Stream Oven discloses the Gap Element, Morningware relies on the testimony of its expert, Mr. Erickson.[14]  He opines that the Jet Stream Oven contains "an air gap between the top surface of the plastic top and the base plate flange."  (Morningware's Invalidity SOF ¶ 17.)  As Morningware points out, Hearthware's expert did not rebut Mr. Erickson's testimony. Hearthware, however, contends that the Court should not credit Mr. Erickson's testimony because he failed to consider the Court's claim construction in this analysis and because his opinion is not based on any empirical data or analysis.  While the Court cannot weigh expert testimony on summary judgment, Hearthware's criticism of Mr. Erickson's testimony, combined with the fact that Mr. Erickson is the inventor of the Jet Stream Oven, creates a genuine dispute

---

[13]  Morningware asserts that the Jet Stream oven is prior art under §§ 102(a) and (b) based on, among other things, Mr. Moon's testimony that he knew of the oven before developing his own oven and that the Jet Stream Oven was sold in the U.S. in 1990.  (Morningware's Invalidity Mot. at 10) (relying on expert testimony of sale date).  Hearthware does not dispute that the Jet Stream Oven is prior art and explicitly refers to it as such.  (Hearthware's Invalidity Opp. at 11.)

[14]  Mr. Erickson is one of the inventors of the Jet Stream Oven, and thus his testimony may have some bias.

35

of material fact as to whether the Jet Stream Oven contains the Gap Element.[15] This is particularly so here, where Morningware must prove invalidity by clear and convincing evidence. *Microsoft*, 131 S. Ct. at 2242.

### 2. Erickson '509 Patent

Morningware argues that the Erickson '509 Patent "explicitly discloses all the elements of claim 3 with the exception of the last limitation."[16] (Morningware's Invalidity Mot. at 10.) Morningware contends that on reexamination of the '217 Patent, the PTO found original claim 1 of the '217 Patent, which Morningware asserts is substantially similar to claim 3 with the exception of the Gap Element,[17] invalid as anticipated by the Erickson '509 Patent. (Morningware's Invalidity SOF ¶ 24.) In support of that assertion, Morningware cites to the examiner's Office Actions, in which the examiner rejected claim 1 of the '217 Patent. (R. 291-11, R. 291-12.) The cited Office Actions, however, do not provide a factual basis for the examiner's rejection of claim 1 in view of the Erickson '509 Patent other than to incorporate by

---

[15] Interestingly, the parties agree that the Jet Stream Oven is a commercial embodiment of the '509 Patent, and Morningware concedes that the Erickson '509 Patent does not disclose the Gap Element of claim 3. (Morningware's Invalidity Mot. at 10; Morningware's Invalidity SOF ¶¶ 20, 23.) This inconsistency further suggests that there is an issue of material fact as to whether the Jet Stream Oven discloses the Gap Element of claim 3.

[16] Morningware asserts that the Erickson '509 Patent is prior art to the '217 Patent, under § 102(b), because the Erickson '509 Patent issued on April 4, 1989, over 10 years prior to the filing date of the '217 patent. (Morningware's Invalidity Mot. at 10.) Hearthware does not dispute that the Erickson '509 Patent is prior art and explicitly refers to it as such. (Hearthware's Invalidity Opp. at 11.)

[17] Hearthware disagrees, contending that the Erickson '509 Patent does not disclose many of the elements of claim 3 of the '217 Patent, including air outlets surrounding the opening of the cooking enclosure, a structure for guiding air flow from the fan chamber in the direction of the upper surface of the cooling enclosure to cool the upper surface of the cooking enclosure, or a cooling manifold. (Hearthware's Resp. to Morningware's Invalidity SOF ¶ 23.)

reference the arguments made in the request for reexamination. (*Id.*) Morningware did not cite

to or provide the Court with the request for reexamination of the '217 Patent. Morningware's

citation to Hearthware's response to the examiner during reexamination is equally unhelpful, as

it does not provide a factual basis for establishing that the Erickson '509 Patent discloses all of

the claim limitations in claim 3 with the exception of the Gap Element. (R. 291-13.) Therefore,

Morningware has failed to provide a sufficient factual basis from which the Court can determine

that the Erickson '509 Patent explicitly discloses all of the elements of claim 3 with the

exception of the Gap Element.[18]

### III. The Court Denies Morningware's Motion for Summary Judgment That the '217 Patent Is Unenforceable Due to Inequitable Conduct

Morningware argues that the '217 Patent is unenforceable due to Hearthware's

inequitable conduct in failing to disclose known material prior art references to the PTO during

prosecution of the '217 Patent. Specifically, Morningware argues that Hearthware failed to

disclose (1) the IMEX Oven; (2) the Jet Stream Oven and Erickson Patents; and (3) the

Nishikawa Patent. Although a reasonable trier of fact could find in favor of Morningware on its

inequitable conduct defense, Morningware has not shown that no reasonable trier of fact could

find in favor of Hearthware. The Court denies Morningware's motion.

---

[18] Because Morningware has not met its burden of establishing that the '217 Patent is obvious, the Court need not address Hearthware's commercial success argument. The Court notes, however, that if Hearthware asserts its commercial success argument at trial, it will be required to prove a nexus between sales from the '217 Patent and the merits of the claimed invention. *See, e.g., In re Applied Materials, Inc*., — F.3d —, 2012 WL 3711586, *9 (Fed. Cir. Aug. 29, 2012) ("Commercial success is relevant to obviousness only if there is a 'nexus . . . between the sales and the merits of the claimed invention.'") (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)).

### A. Morningware's Burden of Proof

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (*en banc*). The Federal Circuit, which has described the inequitable conduct defense as a "plague" and the "atomic bomb" of patent law, recently tightened the standards required to prove inequitable conduct. *See id.* at 1288-89; *see also 1st Media, LLC v. Electronic Arts, Inc.*, — F.3d —, 2012 WL 4017301, at *4 (Fed. Cir. Sept. 13, 2012) (*Therasense* "changed the standard for proving inequitable conduct based on nondisclosure of a reference to the PTO.").

"'In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant *made a deliberate decision* to withhold a *known* material reference.'" *Therasense*, 649 F.3d at 1290 (quoting *Molins PLD v. Textron, Inc.*, 48 F.3d 1172, 1181 (Fed. Cir. 1995) (emphases added in *Therasense*)). After *Therasense*, "absent affirmative egregious misconduct, a defendant must prove by clear and convincing evidence both of the 'separate requirements' that: (1) 'the patentee acted with the specific intent to deceive the PTO'; and (2) the non-disclosed reference was but-for material." *1st Media*, 2012 WL 4017301, at *4 (quoting *Therasense*, 649 F.3d at 1290-91); *see also Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1334 (Fed. Cir. 2012) ("To prevail on an inequitable conduct defense, a defendant must establish both the materiality of the withheld reference and the applicant's intent to deceive the PTO").

The Federal Circuit in *Therasense* "rejected the 'sliding scale' approach to proving inequitable conduct 'where a weak showing of intent may be found sufficient based on a strong

showing of materiality, and vice versa.'" *Aventis Pharma*, 675 F.3d at 1334 (quoting

*Therasense*, 649 F.3d at 1290). Rather, "'[i]ntent and materiality are separate requirements.'"

*Id.* (quoting *Therasense*, 649 F.3d at 1290).[19]  Both intent and materiality are questions of fact.

*See Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008).  "If

the accused infringer meets its burden, then the district court must weight the equities to

determine whether the applicant's conduct before the PTO warrants rendering the entire patent

unenforceable." *Therasense*, 649 F.3d at 1287 (citing *Star Scientific*, 537 F.3d at 1365).

Morningware's burden of proving inequitable conduct at the summary judgment stage is

particularly onerous, as the Federal Circuit has cautioned that a finding of inequitable conduct on

summary judgment is rarely appropriate.  *See Leviton Mfg. Co. Inc. v. Universal Sec.*

*Instruments, Inc.*, 606 F.3d 1353, 1363 (Fed. Cir. 2010) ("We rarely affirm a grant of summary

judgment of inequitable conduct, and in those cases where we have affirmed, the applicants did

something other than fail to disclose a commonly owned application or related litigation."); *see*

*also TecSec, Inc. v. Int'l Business Mach. Corp.*, 763 F. Supp. 2d 800, 809 (E.D. Va. 2011) ("The

Federal Circuit has repeatedly indicated that inequitable conduct defenses are disfavored,

particularly at the summary judgment stage.") (citing *Leviton*, 606 F.3d at 1358)).

---

[19]  At trial, the Court will ultimately decide whether Morningware has met its burden of proving that the '217 Patent is unenforceable due to inequitable conduct.  *See Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1333 (Fed. Cir. 2011) ("Inequitable conduct is equitable in nature, with no right to a jury, and the trial court has the obligation to resolve the underlying facts of materiality and intent.") (citation omitted).

### 1. Materiality

"A prior art reference 'is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art.'" *Aventis Pharma*, 675 F.3d at 1334 (quoting *Therasense*, 649 F.3d at 1291). In assessing materiality, the Court must first "determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference." *Therasense*, 649 F.3d at 1291-92. In doing so, the Court applies the preponderance of the evidence standard and gives claims "their broadest reasonable construction." *Id.*; *see also Aventis Pharma*, 675 F.3d at 1334 ("Unlike the clear and convincing evidence standard for invalidating a patent . . . under 35 U.S.C. §§ 102 and 103, the standard for establishing but-for materiality in the inequitable conduct context only requires a preponderance of the evidence, 'giv[ing] claims their broadest reasonable construction.'") (quoting *Therasense*, 649 F.3d at 1291-92).

### 2. Intent

"To prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO." *Therasense*, 649 F.3d at 1290; *1st Media*, 2012 WL 4017301, at *6. "To satisfy the intent requirement, 'the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it.'" *Aventis Pharma*, 675 F.3d at 1334-35 (quoting *Therasense*, 649 F.3d at 1292); *see also 1st Media*, 2012 WL 4017301, at *4, 9. The Federal Circuit recently reaffirmed that to "meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *1st Media*, 2012 WL 4017301, at *4 (quoting *Therasense*, 649 F.3d

at 1290). In other words, "the evidence 'must be sufficient to *require* a finding of deceitful

intent in the light

of all the circumstances.'" *Therasense*, 649 F.3d at 1290–91 (quoting *Kingsdown Med.*

*Consultants, Ltd. v. Hollister Inc*., 863 F.2d 867, 873 (Fed. Cir. 1988) (emphasis added in

*Therasense*).

### B.     IMEX Oven

Morningware argues that there is no genuine dispute of material fact that the IMEX Oven

is "but-for" material. Specifically, it contends that the IMEX Oven includes all of the elements

of both claim 3 and original claim 1 of the '217 Patent, and therefore the PTO would not have

issued the '217 Patent had it been aware of the IMEX Oven. (Morningware's Inequitable

Conduct Mem. at 6.) In support, it relies solely on Mr. Erickson' expert report. (*Id*., citing

Erickson Report at Table 1 and pp. 11-12 and 14-17). The Erickson Report lays out, in chart and

discussion formats, the elements of claim 3 of the '217 Patent. Mr. Erickson opines that the

IMEX Oven (1) directs cooling air exhaust, and (2) vents hot gases from the cooking enclosure,

both in the same manner as described in claim 3 of the '217 Patent. As the Court explained

above, a genuine dispute of material fact exists as to whether the IMEX Oven contains all of the

limitations of claim 3 of the '217 Patent. The Court recognizes that even if the prior art does not

render a claim invalid, it may nonetheless be material for purposes of the inequitable conduct

inquiry. *See Aventis Pharma*, 675 F.3d at 1334 ("[E]ven if the withheld reference is not

sufficient to invalidate the claim . . . , 'the reference may be material if it would have blocked

patent issuance under the PTO's different evidentiary standards.'") (quoting *Therasense*, 649

F.3d at 1292). Disputed issues of material fact, however, preclude a finding of both invalidity and materiality for purposes of inequitable conduct on summary judgment.

Disputed issues of fact also exist with respect to the intent prong of the *Therasense* analysis, which is a fact-intensive inquiry. *See, e.g., Chamberlain Grp., Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 975 (N.D. Ill. 2010) (denying summary judgment on inequitable conduct defense where there were disputed issues of fact regarding intent, and describing the issue of intent as "peculiarly fact intensive"). As explained below, although Morningware has established that no genuine dispute of material fact exists as to Mr. Moon's knowledge of the IMEX Oven and Hearthware's decision not to disclose the IMEX Oven to the PTO, a dispute of material fact exists as to whether Mr. Moon knew that the IMEX Oven was material.

It is undisputed that Mr. Moon and the co-inventors of the '217 Patent were aware of the IMEX Oven prior to filing the application for the '217 Patent. (Morningware's Invalidity SOF ¶¶ 2, 4, 5, 31.) Indeed, Mr. Moon testified that the co-inventors of the '217 Patent looked at the IMEX Oven as part of the development process in creating Hearthware's oven. (*Id.* ¶¶ 5, 31.) It is also undisputed that Hearthware made a deliberate decision, after discussions with its counsel, not to disclose the IMEX Oven to the PTO.[20] (Morningware's Inequitable Conduct SOF ¶¶ 33, 35.) These facts, while quite significant, are not enough to carry Morningware's burden. *See 1st Media*, 2012 WL 4017301, at *9 (explaining that the infringer must satisfy all three elements of the *Therasense* intent test to support a finding of inequitable conduct); *see also*

---

[20] Morningware has not demonstrated that Mr. Moon himself, as opposed to "Hearthware," made this decision. As noted above, however, Mr. Moon is Hearthware's Chief Executive Officer.

*Optium Corp. v. Emcore Corp.*, 603 F.3d 1313, 1321 (Fed. Cir. 2010) ("[i]ntent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent'") (quoting *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996)).

To meet its burden of proving intent, Morningware must demonstrate by clear and convincing evidence that Mr. Moon knew that the IMEX Oven was material. *See Aventis Pharma*, 675 F.3d at 1334-35 ("To satisfy the intent requirement, 'the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, *knew that it was material*, and made a deliberate decision to withhold it.'") (emphasis added). If Mr. Moon did not know that the IMEX Oven was material, he could not have intended to deceive the PTO by withholding it. *See id.* The parties vigorously dispute whether Mr. Moon knew that the IMEX Oven was material.

Morningware contends that Mr. Moon's knowledge is evidenced by the drawing in which he compared the IMEX Oven with the SKE Oven. (Morningware's Inequitable Conduct Mot. at 8-9.) In that document, Mr. Moon stated that with the IMEX Oven, "cool air cools the timer, the motor, etc.," while in the SKE Oven design, "the air that has become hot is sucked in and makes the PCB, LCD, and motor unnecessarily hot." (Morningware's Inequitable Conduct SOF ¶ 22.) He also states that the IMEX Oven "is the design to go for." (*Id.*) From this, Morningware infers that Mr. Moon instructed Hearthware's engineers to copy the design of the IMEX Oven. Further, Morningware points to the fact that during reexamination of the '217 Patent, Hearthware's counsel argued to the examiner that the '217 Patent was distinct from the Erickson '651 Patent because the Erickson '651 Patent does not disclose the Cooling Manifold Element.

(*Id.* ¶ 18.)  Morningware contends that the IMEX Oven discloses that very feature, and therefore Mr. Moon had to have known that the IMEX Oven's air flow was material.

Additionally, Morningware argues that Mr. Moon knew that the IMEX Oven power head interacted with the cooking enclosure to create a gap.  Morningware asserts that during development of Hearthware's oven, Mr. Moon "tweaked the spacing of the tabs on the power head of his device to be more like that of the IMEX Oven so that they would more easily engage and disengage with the cooking enclosure."  (Morningware's Inequitable Conduct Mot. at 9.) Morningware further contends that Mr. Moon found that the IMEX Oven power head fit better in Hearthware's cooking enclosure than did Hearthware's power head.  (*Id.*)  From this, Morningware infers that Mr. Moon knew that the IMEX Oven disclosed the Gap Element.

Hearthware, on the other hand, contends that Mr. Moon's IMEX Oven drawing and related commentary do not demonstrate that Mr. Moon "tried to hide anything," but rather show only that he believed the IMEX Oven was a better design than the SKE Oven.  (Hearthware's Inequitable Conduct Opp. at 12.)  In his deposition, Mr. Moon testified that although he looked at the IMEX Oven during the development process for Hearthware's oven, he believed that the IMEX Oven was defective and not commercially viable.  (Hearthware's Invalidity Add'l SOF ¶ 38.)  From this evidence, Hearthware draws the inference that Mr. Moon's drawing shows that he preferred the IMEX Oven design, but he wanted to "protect his own innovations" on top of the IMEX Oven design "by filing an application that led to the '217 Patent."  (Hearthware's Inequitable Conduct Opp. at 12.)

Hearthware also challenges Morningware's characterization of Mr. Moon's testimony regarding his knowledge of the "gap" between the power head and the cooking enclosure.[21] (Hearthware's Inequitable Conduct Opp. at 3.)  In addition, Hearthware points to testimony from its Rule 30(b)(6) witness indicating that Hearthware did not disclose the IMEX Oven to the PTO because it did not believe that it was material.  (*See* Hearthware's Inequitable Conduct Add'l SOF ¶ 27.)  Hearthware also relies on its disclosure of U.S. Patent No. 5,404,420 (the "'420 Patent") to Eugene Song, the inventor of the IMEX Oven, in the specification of the '217 Patent. (Hearthware's Inequitable Conduct Mem. at 12.)  According to Hearthware, the '420 Patent discloses the design of the IMEX Oven.  (*Id.*)  It asserts that Mr. Moon would not have included the '420 Patent reference in the specification of the '217 Patent if he had intended to deceive the PTO by not disclosing the IMEX Oven.  (*Id.*)

The Court cannot, based on the undisputed facts in the record, determine conclusively that Mr. Moon knew that the IMEX Oven was material and that the "single most reasonable inference" is that he intended to deceive the PTO by withholding the IMEX Oven during prosecution of the '217 Patent.  *See 1st Media*, 2012 WL 4017301, at *4 (quoting *Therasense*, 649 F.3d at 1290).  Importantly, Morningware cannot meet its burden by proving that Mr. Moon "should have known" that the IMEX Oven is material.  *See Therasense*, 649 F.3d at 1290 ("Proving that the applicant knew of a reference, *should have known* of its materiality, and

---

[21]  Disputed issues of material fact also exist with respect to how much Mr. Moon knew about the "gap" in the IMEX Oven and whether Hearthware "tweaked the design" of its oven based on IMEX's Oven.  In the portions of Mr. Moon's testimony that the parties cite, Mr. Moon's testimony regarding this issue is inconsistent.  (*See* R. 307, Hearthware's Resp. to Morningware's Inequitable Conduct SOF ¶¶ 25-26; *see also* R. 321-10, Moon 7/19/2011 Dep. Tr. 205:3-213:23.)

decided not to submit it to the PTO does not prove specific intent to deceive."); *1st Media*, 2012 WL 4017301, at *6 ("'[a] finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy [the] intent requirement'") (quoting *Therasense*, 649 F.3d at 1290).

Morningware analogizes this case with the facts of *American Calcar, Inc. v. American Honda Motor Co., Inc.*, No. 06-cv-2433, 2012 WL 1328640 (S.D. Cal. Apr. 17, 2012), a case in which the Court determined, after a trial, that one of the inventors of the patent at issue engaged in inequitable conduct. This case does share some factual similarities with *American Calcar*. In both cases, for example, the inventors knew details about the nondisclosed prior art, and the prior art system formed the conceptual starting point for the claimed invention. *See id.* at *9. There are, however, differences between the cases as well. *See, e.g., id.* at *10 (rejecting the inventor's argument that he was negligent or grossly negligent in failing to disclose prior art, relying on the fact that he had "disclosed some information about the system and withheld other information," which "demonstrates a deliberative process, not an accident or a mistake"). Regardless of the factual similarities or dissimilarities, however, the court in *American Calcar* made its inequitable conduct determination *after a trial*, not on summary judgment. The question of Mr. Moon's intent is fact intensive and, in this case, requires a trial. *See Leviton*, 606 F.3d at 1363-64; *see also Chamberlain Grp.*, 756 F. Supp. 2d at 975 (denying motion for summary judgment on inequitable conduct defense where there were disputed issues of fact regarding intent); *Schering Corp. v. Mylan Pharms., Inc.*, No. 09-6383, 2011 WL 3736503, *5 (D.N.J. Aug. 22, 2011) (finding that summary judgment on inequitable conduct claim was inappropriate where a

genuine dispute of material fact existed as to whether the applicant had knowledge of the materiality of withheld prior art).

### C.    The Jet Stream Oven and the Erickson and Nishikawa Patents

Morningware asserts that the Jet Stream Oven is material because it includes all of the elements of claim 3 and original claim 1 of the '217 Patent. (Morningware's Inequitable Conduct Mem. at 7.) Further, Morningware argues that the Erickson Patents are also material because the Jet Stream Oven embodies those patents, and on reexamination of the '217 Patent, the examiner found that the Erickson '509 Patent anticipated original claim 1 of the '217 Patent. The related Erickson '328 Patent contains the same disclosure as the Erickson '509 Patent. As the Court explained above, however, genuine disputes of material facts exist as to whether the Jet Stream Oven and the Erickson '509 Patent disclose all of the limitations of claim 3 of the '217 Patent. In addition to the reasons set forth previously, the examiner had the Erickson '509 and '651 Patents before him during prosecution of the '217 Patent, yet still allowed the '217 Patent to issue. (See '217 Patent.) Moreover, as Hearthware points out, the examiner reviewed both the Erickson '509 and '328 Patents during the reexamination proceeding and chose not to reexamine claim 3 of the '217 Patent, which is the only claim that Hearthware asserts in this case.

Morningware does not argue that the Nishikawa Patent, alone, is material to claim 1 or claim 3 of the '217 Patent. (R. 332, Morningware's Inequitable Conduct Reply at 8.) Instead, Morningware contends that the Nishikawa Patent discloses "a cooling manifold including a lower surface facing an upper surface of the cooking enclosure," which Hearthware asserted is absent from the Erickson '651 Patent during prosecution of the '217 Patent. (See R. 332,

47

Morningware's Inequitable Conduct Reply at 8.)  Specifically, Morningware asserts that

Hearthware and its attorney argued during prosecution of the '217 Patent that

> Erickson et al. does not disclose or suggest a cooling manifold including a lower
> surface facing an upper surface of the cooking enclosure, as recited in claim 1.
> Accordingly, the rejection of claim 1 should be withdrawn and the claim allowed.

(Morningware's Inequitable Conduct SOF ¶ 18; Hearthware's Inequitable Conduct Add'l SOF

¶ 20.)  The Nishikawa Patent recites that "the Silocco fan 21 is rotated to forcibly exhaust hot air

in the radiating chamber 17, which results from the radiation of heat produced from the sheath

heater 23, through an exhaust hole 26 to the outside of the outer case 9, thus preventing

excessive temperature rise of the ceiling of the outer case."  (Morningware's Inequitable

Conduct SOF ¶ 19.)  Accordingly, Morningware argues that if Hearthware had disclosed the

Nishikawa Patent and the Erickson '651 Patent to the examiner during prosecution of the '217

Patent, the examiner would not have allowed original claim 1 of the '217 Patent to issue.  (R.

332, Morningware's Inequitable Conduct Reply at 8.)

 Based on the evidence in the record, the Court cannot conclude at the summary

judgment stage that the examiner would not have allowed the '217 Patent to issue if he or she

had been aware of the Nishikawa Patent.  The portion of the Nishikawa Patent that Morningware

cites, for example, does not disclose "a cooling manifold" with a "lower surface" that faces the

"upper surface."  (*See* Morningware's Inequitable Conduct SOF ¶ 19.)

Moreover, a genuine issue of material fact exists as to whether Mr. Moon intended to

deceive the PTO by withholding the Jet Stream Oven and the Erickson and Nishikawa Patents

during prosecution of the '217 Patent.  As with the IMEX Oven, Hearthware does not dispute

that Mr. Moon and his counsel were aware of the Erickson Patents, Jet Stream Oven, and the

Nishikawa Patent before filing the application for the '217 Patent. (Morningware's Inequitable Conduct SOF ¶¶ 6-8, 10-11.) Indeed, Mr. Moon and the co-inventors of the '217 Patent compared Hearthware's oven to the Jet Stream Oven to create their design. (*Id*. ¶¶ 6-7.) Moreover, Hearthware does not dispute that Mr. Moon's counsel made a conscious decision not to disclose any prior art to the PTO. (*Id*. ¶ 35.) As with the IMEX Oven, however, there is a genuine dispute of material fact as to whether Mr. Moon knew that the Erickson Patents, Jet Stream Oven, and the Nishikawa Patent were material. Morningware argues that Mr. Moon appreciated the materiality of the Erickson and Nishikawa Patents because "Mr. Moon provided [those patents], obtained from his counsel, to SKE to assure SKE that they invalidated the IMEX Patent asserted against Mr. Moon's oven." (Morningware's Inequitable Conduct Mem. at 11.) Morningware further argues that Mr. Moon explained that Hearthware's oven did not infringe the Erickson and Nishikawa Patents. (*Id*.)

The record is insufficient to meet Morningware's extremely high burden of proving inequitable conduct by clear and convincing evidence at the summary judgment stage. *See Leviton*, 606 F.3d at 1363-64. Morningware provides no factual citation for its statement regarding Mr. Moon's purported purpose in providing the patents to SKE, and the Court therefore cannot determine whether Hearthware disputes that fact. Even assuming that Morningware could prove this assertion, it is unclear how Mr. Moon's belief that the Nishikawa and Erickson Patents invalidate the IMEX patent equates to knowledge that the examiner would not have issued the '217 Patent if Mr. Moon had disclosed the Erickson and Nishikawa Patents to the examiner. The Court cannot determine, based on the undisputed facts in the record and

49

without a trial, that the inference of intent is the "single most reasonable" inference. *See 1st Media*, 2012 WL 4017301, at *4.

## CONCLUSION

For the reasons explained above, the Court denies Morningware's motions for summary judgment as to noninfringement, invalidity, and unenforceability due to inequitable conduct.

**DATED: September 26, 2012**                    **ENTERED**

**AMY J. STEEVE**
**United States District Court Judge**

50